[Cite as *In re L.R.*, 2019-Ohio-2305.]

STATE OF OHIO        )              IN THE COURT OF APPEALS
                         )ss:          NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT    )

| | |
|---|---|
| IN RE: L.R.<br>      L.R. | C.A. Nos.    29266<br>                    29271<br><br><br>APPEAL FROM JUDGMENT<br>ENTERED IN THE<br>COURT OF COMMON PLEAS<br>COUNTY OF SUMMIT, OHIO<br>CASE Nos.   DN 16-06-000495<br>                    DN 16-06-000496 |

DECISION AND JOURNAL ENTRY

Dated: June 12, 2019

---

HENSAL, Judge.

**{¶1}** Appellants Mother and Father appeal the judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated their parental rights to their children 1-L.R. and 2-L.R. and placed the children in the permanent custody of appellee Summit County Children Services Board ("CSB" or "the agency"). This Court affirms.

I.

**{¶2}** Mother and Father are the biological parents of 1-L.R. (d.o.b. 2/9/14) and 2-L.R. (d.o.b. 5/23/16). Both children are medically fragile and suffer from multiple serious conditions. 1-L.R. has chronically experienced a failure to thrive, gaining weight during his multiple hospitalizations, but losing weight quickly again when back in the care of Mother and Father. 2-L.R. was born extremely prematurely. At the time of 2-L.R.'s birth, 1-L.R. was receiving treatment during one of his many hospitalizations. Based on the parents' failure to manage 1-

L.R.'s medical conditions, CSB filed a complaint alleging that child to be neglected and dependent. The same day, the agency filed a complaint alleging 2-L.R. to be a dependent child based on Mother's and Father's failure to consistently feed and visit with the premature infant in the hospital. By stipulation of the parties, both children were placed in the emergency temporary custody of CSB upon their respective releases from the hospital.

{¶3} Based upon CSB's dismissal of its allegations of neglect regarding 1-L.R. and one of two allegations of dependency regarding 2-L.R., Mother and Father waived their rights to an adjudicatory hearing and stipulated that both children were dependent pursuant to Revised Code Section 2151.04(C). Thereafter, Mother and Father waived their rights to a dispositional hearing and agreed to placement of the children in the temporary custody of CSB. Mother and Father were to have supervised visitations with the children. The juvenile court adopted the agency's proposed case plan as the order of the court. Mother's and Father's initial objectives included that they (1) work with medical professionals to understand how to care for the children's medical needs and demonstrate that ability, (2) obtain mental health assessments and follow all recommendations, and (3) obtain and maintain safe and stable housing. The juvenile court further found that CSB had used reasonable efforts to prevent the continued removal of the children from their home.

{¶4} At the first review hearing, the magistrate again made the same reasonable efforts finding. The children continued in the agency's temporary custody. Five months later at another review hearing, the magistrate once more found that CSB had used reasonable efforts to prevent the continued removal of the children from their home. The magistrate maintained 1-L.R. and 2-L.R. in the agency's temporary custody but ordered a liberal increase in the parents' visitation

based in part on the recommendation of the guardian ad litem that the children be returned to Mother's legal custody under protective supervision of CSB.

{¶5} On May 3, 2017, the agency filed an amended case plan, noting that the children had been moved to an out-of-county foster home better equipped to handle the children's medical issues, and recognizing that there may be challenges to the parents' ability to visit based on the distance of the placement. CSB also added case plan objectives requiring Mother and Father to submit to mental health diagnostic and parenting assessments at Summit Psychological Associates. Approximately three weeks later, the agency filed a motion for permanent custody. As grounds, CSB alleged that the children should not or cannot be returned to Mother and Father based on their failures to remedy the conditions that led to the children's removal, as well as the parents' chronic mental health and other delays that prevented them from providing an adequate permanent home. Mother and Father each filed motions for legal custody.

{¶6} On July 5, 2017, CSB filed another amended case plan adding more requirements for Mother and Father, including: (1) basic and specialized parenting education addressing the children's medical conditions and needs, (2) smoking cessation programs due to the children's respiratory issues, and (3) attendance at all medical and specialized educational services appointments for the children. In addition, Father was required to (1) submit to a psychiatric evaluation, and (2) participate in outpatient substance abuse treatment, abstain from drugs and alcohol, and submit to urine screens. Father filed objections to the proposed amended case plan. After a hearing, the magistrate rejected the July 5, 2017 amended case plan and adopted the May 3, 2017 amended case plan.

{¶7} CSB opposed Father's objections to the July 5, 2017 amended case plan. The guardian ad litem filed a report recommending rejection of the July 5, 2017 amended case plan.

After a hearing, the magistrate adopted the July 5, 2017 amended case plan except for the requirement for Father to participate in drug and alcohol treatment and submit to urine screens. Instead, the magistrate ordered Father to complete a drug and alcohol abuse evaluation. Father moved to set aside the magistrate's order. The juvenile court denied Father's motion and adopted the July 5, 2017 amended case plan with the modifications ordered by the magistrate.

{¶8} Mother's and Father's parenting assessments identified delays hindering their abilities to appropriately parent their medically fragile children. Accordingly, CSB moved to withdraw its motion for permanent custody, and instead moved for a retroactive first six-month extension of temporary custody, as well as a second six-month extension, to allow the parents time to work on those issues in pursuit of reunification.

{¶9} The visiting judge assigned to proceed over the permanent custody hearing held a status hearing and issued the following orders. He removed the agency protective caseworker and ordered the appointment of a different caseworker. The visiting judge adopted the recommendations in the most recent report of the guardian ad litem, specifically: (1) to maintain the children in CSB's temporary custody; (2) that CSB allow Mother and Father access to the children's online MyChart accounts relating to medical appointments and reports; (3) that CSB provide Mother and Father with immediate training relating to the children's gastronomy tube ("G-tube") feedings; (4) that CSB allow visitations outside the visitation center once the parents have demonstrated the ability to administer G-tube feedings appropriately; (5) that CSB ensure that the children continue to receive developmental treatment; (6) that CSB continue providing transportation assistance to Mother and Father; (7) that Mother and Father attend all of the children's medical appointments and follow through as advised; (8) that Mother and Father maintain safe and stable housing; and (9) that Mother continue counseling and complete

parenting classes. In addition, the juvenile court ordered the guardian ad litem to coordinate with the children's medical professionals to create a check list for the parents to facilitate G-tube feedings. Medical professionals were ordered to supervise the children's feedings by Mother and Father until the professionals determined that the parents could feed 1-L.R. and 2-L.R. without supervision. The visiting judge thereafter had no further involvement in the case below.

{¶10} A new caseworker was appointed to oversee the case. At the same time, a new court appointed special advocate assumed the role of the guardian ad litem to represent the best interest of the children.

{¶11} At a review hearing 23 months into the case, the magistrate found that CSB had used reasonable efforts to prevent the continued removal of the children from their home. No party moved to set aside the magistrate's order. Two weeks later, CSB filed its second motion for permanent custody. Mother and Father filed individual motions for legal custody.

{¶12} At the permanent custody hearing, the parties stipulated to CSB's allegation that the children had been in the temporary custody of the agency for 12 of the prior 22 consecutive months. After finding that it was in the best interest of the children, the juvenile court placed 1-L.R. and 2-L.R. in the permanent custody of CSB. The juvenile court further found that the agency had used reasonable efforts to prevent the continued removal of the children from their home. Mother and Father filed timely appeals in which they each raise two assignments of error. This Court consolidates the parents' assignments of error where they address the same issues to facilitate review.

## MOTHER'S ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO [CSB] OF [THE CHILDREN] WHEN THE AGENCY FAILED TO PROVIDE REFERRALS TO ACCESSIBLE SERVICES, COMPLY WITH COURT

ORDERS, AND MAKE REASONABLE EFFORTS TO REUNIFY THE FAMILY.

**FATHER'S ASSIGNMENT OF ERROR I**

THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY OF [THE CHILDREN] TO [CSB] WHEN THE AGENCY FAILED TO COMPLY WITH COURT ORDERS AND PROVIDE REASONABLE EFFORTS TO REUNIFY THE FAMILY.

**{¶13}** Mother and Father argue that the juvenile court erred by granting permanent custody of the children to CSB, because the agency failed to use reasonable efforts to reunify the children with their parents. This Court disagrees.

**{¶14}** Revised Code Section 2151.419 addresses when the juvenile court must determine whether the child protection agency has made reasonable efforts towards reunification of the children with their parents. This Court recently noted the well settled conclusion that "the statute imposes no requirement for such a determination at the time of the permanent custody hearing unless the agency has not established that reasonable efforts have been made prior to that hearing." (Internal quotations omitted.) *In re J.W.*, 9th Dist. Summit Nos. 28966 and 28976, 2018-Ohio-3897, ¶ 6 (superseded in part on other grounds), quoting *In re A.C.-B.*, 9th Dist. Summit Nos. 28330 and 28349, 2017-Ohio-374, ¶ 22; *see also In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 41-43 (concluding that a reasonable efforts determination is necessary at a permanent custody hearing only if the agency has not demonstrated its use of reasonable efforts prior to that time).

**{¶15}** In this case, the juvenile court found that CSB had used reasonable efforts to prevent the continued removal of the children from their home at the adjudicatory and initial dispositional hearings. The trial court made findings at two subsequent review hearings that

CSB had used reasonable efforts to prevent the continued removal of the children from their home. Although the magistrate later found, after the sunset dispositional hearing almost a year after the initiation of the cases, that CSB had not used reasonable efforts to finalize a permanency plan for the children, that finding was solely for purposes of the annual judicial determination required to maintain Title IV-E funding eligibility for the children. Specifically, the magistrate found that the caseworker had not been to the parents' home for two to three months, had not made any referrals for parenting education for Mother and Father, and had delayed making referrals for the parents' mental health assessments. In addition, the magistrate found that the prior foster family had failed to take the children to medical appointments; that the agency relocated the children out of county, making it difficult for Mother and Father to attend appointments based on a lack of transportation; and that the bus passes provided by CSB were ineffective to allow Mother and Father to travel outside of Summit County for appointments. The magistrate then adopted the May 3, 2017 amended case plan. The juvenile court adopted the magistrate's findings and orders.

{¶16} A couple months later, after a hearing and consideration of post-hearing motions, the juvenile court adopted the July 5, 2017 amended case plan with certain modifications set forth earlier in this opinion. Thereafter, CSB withdrew its motion for permanent custody and requested two six-month extensions of temporary custody to give Mother and Father time to work on their most recent case plan objectives. At a review hearing five months later, the magistrate issued an order finding that CSB had used reasonable efforts to prevent the continued removal of the children from their home. Neither parent moved to set aside that order.

{¶17} CSB filed its second motion for permanent custody. Mother and Father each filed motions for legal custody, with protective supervision if necessary. At another sunset hearing

held two years and one day after the agency filed its complaints, the magistrate again found that CSB had used reasonable efforts. Neither parent filed objections to the magistrate's decision, and the juvenile court adopted the magistrate's findings and orders.

{¶18} Notwithstanding the agency's earlier failure to use reasonable efforts to finalize a permanency plan, the juvenile court consistently found that CSB had used reasonable efforts to prevent the continued removal of the children from their home. As neither parent disputed those findings of the magistrate via motions to set aside or objections, Mother and Father have forfeited their challenge to the agency's use of reasonable efforts on appeal except for a claim of plain error. *See In re J.W.*, 2018-Ohio-3897, at ¶ 7, citing *In re S.D.*, 9th Dist. Lorain Nos. 15CA010864 and 15CA010867, 2016-Ohio-1493, ¶ 25; *see also* Juv. R. 40(D)(3)(b)(iv). As neither Father nor Mother have alleged plain error, this Court will not construct an argument on his or her behalf. *See In re N.C.*, 9th Dist. Summit Nos. 27116 and 27118, 2015-Ohio-1627, ¶ 62, citing Juv.R. 40(D)(3)(b)(iv), App.R. 12(A)(2), and App.R. 16(A)(7). Furthermore, as neither parent has provided the transcripts of the hearings at which the juvenile court made its reasonable efforts determinations, we are constrained to presume regularity regarding those determinations. *See In re S.D.* at ¶ 25, citing *In re T.K.*, 9th Dist. Summit No. 24006, 2008-Ohio-1687, ¶ 22.

{¶19} Moreover, at the permanent custody hearing, Mother and Father both stipulated to a finding that the children had been in the temporary custody of CSB for at least 12 of the prior 22 months. Both parents asserted that they were merely challenging the agency's assertion that an award of permanent custody was in the best interest of the children.

{¶20} Revised Code Section 2151.413(D)(3)(b) expressly prohibits the agency from moving for permanent custody on the basis that a child has been in the agency's temporary

custody for 12 of 22 months if, when required to do so, the agency "has not provided the services required by the case plan to the parents of the child or the child to ensure the safe return of the child to the child's home."  Accordingly, inherent in an agency's "12 of 22" allegation is that it has engaged in reasonable efforts towards reunification.

{¶21}  In this case, CSB alleged as its sole first-prong basis for permanent custody that 1-L.R. and 2-L.R. had been in its temporary custody for at least 12 of the prior 22 months.  There is no dispute that CSB was not relieved of its duty to use reasonable efforts to facilitate reunification of the children with Mother and Father.  By stipulating to CSB's "12 of 22" allegation, Mother and Father necessarily recognized that the agency had used reasonable efforts to prevent the continued removal of the children from their home.  *Compare In re H.S.*, 9th Dist. Summit Nos. 28944 and 28948, 2018-Ohio-3360, ¶ 14-24 (where the parents did not stipulate to a "12 of 22" finding and the evidence demonstrated that the agency had failed to use reasonable efforts in support of reunification).  Mother's and Father's first assignments of error are overruled.

### MOTHER'S ASSIGNMENT OF ERROR II

THE TRIAL COURT'S GRANT OF PERMANENT CUSTODY TO [CSB] WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

### FATHER'S ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO [CSB] AS IT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶22}  Mother and Father argue that the juvenile court's award of permanent custody of the children to CSB was against the manifest weight of the evidence.  This Court disagrees.

{¶23}  In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers

the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶24} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under Revised Code Section 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under Section 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996). Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶25} Revised Code Section 2151.414(D) provides guidance regarding the best interest determination. Subsection (D)(1) lists factors that the juvenile court must consider and weigh in its determination. Those best interest factors include: the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, the child's need for permanence

and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in Section 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see also In re R.G.*, 9th Dist. Summit Nos. 24834, 24850, 2009-Ohio-6284, ¶ 11. Subsection (D)(2), however, provides a checklist of circumstances, where the existence of all mandates a finding that permanent custody is in the best interest of the children. Those circumstances include: one or more Subsection (E) factors exist and the child cannot be placed with the parents within a reasonable time, the child has been in agency custody for two years or longer and is no longer eligible for temporary custody pursuant to Revised Code Section 2151.415, the child is ineligible for a planned permanent living arrangement, and no relative or other interested third party is seeking legal custody of the child. R.C. 2151.414(D)(2)(a)-(d).

{¶26} CSB alleged that permanent custody was in the best interest of 1-L.R. and 2-L.R. pursuant to both Subsection (D)(1) and (2), and the juvenile court made findings as to both. Because this Court concludes that the evidence demonstrated that an award of permanent custody was in the children's best interest pursuant to consideration of the factors listed in Section 2151.414(D)(1), we decline to consider the applicability of Section 2151.414(D)(2) to this case.

{¶27} To the extent that Mother and Father continue to argue that CSB failed to use reasonable efforts to facilitate reunification, this Court declines to address that issue beyond our discussion relating to the parents' first assignments of error. We further disagree with the parents' assertion that they had only five months in which to complete their case plan objectives. Although the agency filed its second motion for permanent custody five months after the juvenile court removed the then-current caseworker and added additional requirements to the case plan it adopted a month earlier for both CSB and the parents, the permanent custody hearing was not

held for another five-and-a-half months. Accordingly, Mother and Father had almost eleven months in which to work to complete their current objectives.

{¶28} As noted above, Mother and Father stipulated that 1-L.R. and 2-L.R. had been in the temporary custody of CSB for at least 12 of the prior 22 months when the agency filed its motion for permanent custody. Accordingly, they limit their challenge to the juvenile court's determination that CSB satisfied the second prong of the permanent custody test. Although neither parent cites any best interest factors, this Court reviews the juvenile court's determination that an award of permanent custody was in the children's best interest within the proper legal context.

Custodial history of the children

{¶29} 1-L.R. was not yet two-and-a-half years old when he was removed from his parents' home. During the time the child was in Mother's and Father's custody, he spent a lot of time in the hospital because of complications due to prematurity and his many medical issues. 2-L.R. was never in her parents' custody, because CSB received a springing order of emergency temporary custody within days of the child's birth. Upon her ultimate release from the hospital after birth, the child was placed in foster care. Although the children have been in three different foster homes during the case, they had been residing in the third home for 21 months at the time of the permanent custody hearing.

Interactions and interrelationships of the children

{¶30} Reports indicated that the children have a bond with Mother and Father, although 1-L.R. appeared more closely connected with his parents than 2-L.R. did. The children's occupational therapist from Stark County Board of Developmental Disabilities met twice with Mother and Father during sessions with the children. Although Mother was receptive to

instruction regarding using age-appropriate toys and activities with the children, she did not take any initiative to extend the play concepts or her interactions with the children during the second session. Mother confined her activities to merely imitating the therapist. Father confined his interactions during the session to 1-L.R. and did not attempt to engage with 2-L.R.

{¶31} According to the foster mother, 2-L.R. becomes clingy and cries when it is time for visitation. While 1-L.R. is always excited to see Mother and Father, the child appears "on edge" after visits, requiring a lot of redirection and reassurance from his foster mother. The child's teacher noticed that 1-L.R. is sometimes upset and hits and yells after visits with Mother and Father.

{¶32} The caseworker expressed concerns regarding the parents' interactions with the children. Mother and Father do not use age-appropriate or developmentally-appropriate toys with the children. Repeatedly, and despite the caseworker's guidance, Father would merely give his keys to 1-L.R. to keep the child occupied. While Mother would interact with the children, Father spent the bulk of his time at visitations sitting on the couch.

{¶33} The children have been placed together throughout the case. They are both happy and well acclimated to their environment in foster care.

Wishes of the children

{¶34} The children are too young to express their wishes. The guardian ad litem opined that permanent custody would be in the best interest of the children.

The children's need for permanence

{¶35} Both children are extremely medically fragile and developmentally delayed. Some conditions arose as a result of the children's premature births. All conditions require regular appointments and ongoing treatment and monitoring. Both children are on modified

diets with food restrictions and require the ongoing care of a dietician. 1-L.R. and 2-L.R. are too young to meet any of their own basic and special needs and require the consistent assistance of committed caregivers who understand the significance and severity of their conditions.

{¶36} 1-L.R. suffers from bronchopulmonary dysplasia (a chronic lung disease), asthma, swallowing issues, pulmonary hypertension, chronic kidney disease, autism, epilepsy, and vision problems. He wears braces on his legs. The braces are fitted to the child's body and must be positioned correctly to work effectively and maintain their physical integrity. The child is dependent on a G-tube for all nutrition, fluids, and medication intake. He may not take any liquids or feedings by mouth. 1-L.R. receives three one-hour feedings each day and a 10-hour continuous feeding overnight. It is critical that the child consistently receive feedings at the prescribed rate and volume to prevent the risk of dehydration which exacerbates his kidney dysfunction. At best, the child's kidneys function at a 50-60% efficiency rate even with dedicated commitment to his strict feeding regimen, so diversion from those requirements leads to medical distress and hospitalization. At the age of four-and-a-half years, 1-L.R.'s kidneys are the size of a newborn's. The child's asthma is severe. He requires daily treatments, including an inhaled steroid and various allergy medications, plus an Albuterol inhaler as needed. 1-L.R. requires an environment free from irritants, including cigarette smoke and residue, scented candles, and air fresheners, to prevent flare ups. In addition to routine medical care, 1-L.R. sees specialists in nephrology, gastroenterology, developmental pediatrics, developmental psychology, neurology, and ophthalmology.

{¶37} 2-L.R. suffers from allergies, gastrointestinal intolerances, respiratory issues, swallowing issues, and cerebral palsy. She also receives some nutrition and medications via a G-tube, although she is in the process of weaning from tube feedings. She requires an extensive

number of medications, including gastrointestinal medications, an inhaler, and an EpiPen in case of emergency. Like her brother, 2-L.R. requires an environment free from respiratory irritants. All food the child takes by mouth must be pureed to the proper consistency to prevent choking and aspiration. She too wears braces on her legs. In addition to normal pediatric care, the child has regular appointments with specialists in developmental pediatrics, physiatry, gastroenterology, and immunology.

{¶38} A psychology assistant ("Mr. S.") at Summit Psychological Associates, whom the trial court qualified as an expert regarding parenting evaluations, administered multi-day assessments of both Mother and Father. The assessments included personality tests, intelligence tests, interviews, and self-reporting. Mr. S. identified multiple issues which impacted both parents' abilities to adequately parent the children.

{¶39} Mr. S. opined that Father presented as immature, self-indulgent, manipulative, and chronically maladjusted. Father admitted to a history of suicidal ideations, as well as homicidal ideations when angered or provoked. He also reported that he suffers from hypertension and diabetes, but that he has not taken medications for those conditions since 2012. He was adamant that he would not take medications for mental health issues if prescribed. Based on the evaluation, Mr. S. diagnosed Father with unspecified personality disorder with antisocial traits and mild alcohol disorder. He further provisionally diagnosed Father with bipolar II disorder and moderate cannabis use disorder in sustained remission. Mr. S. opined that Father requires mental health treatment to address his many issues, particularly impulse control.

{¶40} Father demonstrated a significant lack of parenting knowledge, as well as an unawareness of his deficits in caring for his children. He was unable to identify potential medical conditions that would require treatment, developmental stages of childhood, and

community resources he could access to obtain information or assistance. Specific to his children, Father acknowledged that 1-L.R. has medical issues, but he believed that the child's medications had been discontinued. Father denied that 2-L.R. required specialized care and treatment. When questioned about discipline, Father asserted that he would not discipline the children because they have no behavioral issues. Father demonstrated a lack of understanding regarding CSB's involvement with the family. Father believed that the agency took the children merely because 1-L.R. had too many medical appointments.

{¶41} Mr. S. recommended that Father quit smoking, attend all of the children's medical appointments, and obtain a psychiatric evaluation, substance abuse treatment, and parenting education including instruction on how to care for the children's medical needs. Were Father to fail to follow through with those recommendations, Mr. S. opined that the children would be at risk for harm from neglect in Father's care.

{¶42} Mr. S. described Mother as an individual who was attempting to portray herself very favorably during her parenting evaluation, to the extent that she denied problems that virtually every person acknowledges and experiences. She too was unable to identify common childhood illnesses, signs and symptoms of medical emergencies, childhood developmental milestones, and community resources to address concerns. Mother knew that 1-L.R. has a G-tube for feeding but was unable to describe the child's medical issues and treatments. For example, she did not understand that 1-L.R. requires regular weight checks and maintenance, that the child has asthma and uses an inhaler, and that smoking around the child is contraindicated. Mother was unable to identify the symptoms of kidney disease. She asserted that she would let 1-L.R. decide when and what to eat. Mother was aware that 2-L.R. ate every three to four hours, but she did not acknowledge any other issues for that child.

{¶43} Mr. S. diagnosed Mother with borderline intellectual functioning and an unspecified personality disorder based on her self-centered behaviors and lack of regard for the children's medical needs. He recommended that Mother quit smoking, attend parenting classes including one-on-one instruction for caring for the children's specialized needs, and attend all medical appointments for the children.

{¶44} Mother and Father received training regarding G-tube feedings when 1-L.R. was released to their care after initial implementation of tube feedings. In addition, they were notified of every medical appointment for each child, and Mother had access to MyChart, an online service to access appointment information for the children. In January 2018, CSB contracted with a registered nurse/certified pediatric nurse practitioner to provide one-on-one training for Mother and Father to properly conduct G-tube feedings for both children. Despite these opportunities and trainings, Mother and Father were not able to demonstrate the ability or understanding of how to properly, consistently, and safely administer the children's G-tube feedings. The nurse testified that Mother understood the need for the G-tubes; skin care around the button sites; how to prime the pump, hook it up, monitor, disconnect, and trouble shoot minor problems like a kinked tube. Because of the invasive nature of replacing buttons in the children's stomachs, Mother and Father only practiced on a doll. The nurse was satisfied with the parents' foundational knowledge, but she admitted that everything was already prepared for the parents to feed the children at visits. The nurse could not say that Mother and Father would be able to prepare the children's formulas, medications, and equipment for use away from a controlled environment.

{¶45} The children are authorized to receive new buttons quarterly. The buttons must be turned to unlock them to accomplish feedings. They are sturdy mechanisms and designed to

last up to six months. Nevertheless, 1-L.R.'s button has had to be replaced frequently after feedings by Mother and Father because of excessive leaking due to hyper-turning of the lock. Mother and Father denied noticing any problems with the children's buttons. Leaking buttons are cause for serious concerns for the health of the children because they receive medications via G-tube and their fluid/dietary needs are so strict. Variances in food and liquids intake are particularly problematic for 1-L.R. who will suffer significant problems due to his kidney dysfunction.

{¶46} The second caseworker worked with Mother and Father for 11 months prior to the permanent custody hearing. She attended every medical appointment for the children (11 for 1-L.R.; eight for 2-L.R.) during that time. Mother only attended approximately half of the appointments, while Father attended fewer than that. Important and current information was presented at every appointment. On some occasions when Mother and Father appeared for medical appointments, they chose to remain in the lobby area to take or make phone calls instead of attending the appointment where they could ask questions and receive important information.

{¶47} Mother and Father maintained consistent housing throughout the case, although there were issues for concern. The refrigerator had not been working for a couple months at the time of the hearing, the hot water heater was broken, and the apartment reeked of body odor, cigarette smoke, and air fresheners used to try to mask the odors. Mother and Father repeatedly declined to participate in smoking cessation classes despite the grievous effects of second- and third-hand smoke on their asthmatic children. So bad was the situation that 1-L.R. would cough, sneeze, and require removal to a well ventilated area after merely hugging Father whose clothes had absorbed the smell of cigarettes. Routinely after visits with Mother and Father, the children required the use of inhalers because of their exposure to respiratory irritants.

**{¶48}** Although there exist no specialized parenting classes to address the particular needs of these medically fragile children, Mother and Father had the opportunity to learn how to care for the children by attending their medical appointments. In addition, they received one-on-one training from a nurse trained in G-tube feedings. They were trained and assisted during visits to properly put on the children's leg braces. Moreover, Mother and Father received the services of Fast Track at two separate points during the case. Their case manager from Fast Track met with Mother and Father in their home based on two separate referrals. Although the program lasts three months, the first case manager worked with Mother and Father for a full year based on their cooperation. The second case manager worked with the parents for three months but had to terminate them unsuccessfully for failure to keep appointments. Although Mother and Father made some progress, much of the time was spent addressing Mother's anxiety and both parents' anger due to the agency's involvement. Accordingly, the Fast Track case manager was unable to focus on helping the parents to work on case plan compliance.

**{¶49}** The parents continually failed to make appointments with providers. After the Fast Track case manager handed Father a phone to schedule an appointment with Summit Psychological, Father overslept and missed the appointment. Although he rescheduled, he missed the subsequent appointment too. To help Mother and Father understand the medical needs of the children, the case manager directed them to make note cards listing the children's medications and their purposes. Mother and Father never did that. The guardian ad litem provided Mother and Father with a notebook to list their questions and concerns for medical professionals and to note information during visitations, e.g., amounts of the children's feedings and whether diapers were changed. The parents failed to use the notebook.

{¶50} The guardian ad litem reported that Mother and Father were not appropriate caregivers for the children. The family home was cluttered and smelled excessively of body odor and cigarette smoke. A full ashtray was observed on a table during the guardian's visit to the home a week earlier. The refrigerator and hot water heater were not working. Despite a surplus of income to meet their basic needs, Mother and Father claimed to be unable to pay for services relevant to the care of their children. Furthermore, the agency established that although Mother and Father had a surplus of $800 per month after paying bills and buying necessities, Mother and Father asserted that $20 weekly parenting education classes were cost prohibitive.

{¶51} Of particular concern to the guardian ad litem was Mother's and Father's lack of basic understanding regarding the needs of the children. Despite repeated assistance, Mother and Father frequently put the children's leg braces on the wrong legs and upside down. The parents have overfed 1-L.R. at visits despite the importance that the child receive prescribed measured quantities during feedings. Mother admitted to feeding 1-L.R. sherbet and lemonade by mouth even though she knew the child was not allowed to take any food orally. The parents would rarely engage in a dialogue with medical professionals. When questioned about the children's care, Mother and Father would assert that they understood, but then they could not explain important medical terms and care instructions. The guardian ad litem reported that the parents' pretending to understand the children's special needs put 1-L.R. and 2-L.R. at significant risk of neglect and harm. The guardian ad litem asserted that the best interest of the children required that they be placed in the permanent custody of CSB to ensure that their special needs would be met consistently and safely.

{¶52} Because of the numerous special needs of the children, they require an environment where their needs will be met on a consistent basis. 1-L.R. and 2-L.R. require

caregivers who understand their medical conditions and needs and are willing and able to attend all appointments, maintain an irritant-free environment, and pay close attention to the preparation and administration of their medications and feedings.

Applicability of Revised Code Section 2151.414(E)(7)-(11) factors

{¶53} No factors listed in Section 2151.414(E)(7)-(11) are applicable to this case.

Conclusion

{¶54} Based on a review of the record, this is not the exceptional case where the finder of fact clearly lost its way and created a manifest miscarriage of justice in awarding permanent custody of 1-L.R. and 2-L.R. to CSB. The evidence demonstrates that the children are medically fragile and require consistent specialized care to meet their needs and ensure their health, safety, and welfare. Despite the intervention of multiple service providers, Mother and Father have not developed an understanding regarding the significance of the children's medical conditions and treatments. Minor deviations from prescribed feedings can easily result in the need for hospitalization. Attendance at all medical appointments is necessary to ensure that the children's current needs are being met. Mother and Father have failed to attend many medical appointments, claiming to have overslept or not being aware of appointment times despite access to MyChart. Although they could complete G-tube feedings in a controlled environment where everything had been prepared for them, Mother and Father demonstrated no understanding of what was required to prepare the children's food and medications themselves. Frequently, the children's G-tube buttons leaked after feedings by the parents. Mother and Father overfed 1-L.R. and gave him food by mouth, despite knowing that that was proscribed. Not only was the family home rife with respiratory irritants that would send the children into distress, Mother and Father did not ensure that they wore irritant-free clothing during visitations. While no party

disputed that Mother and Father love the children, they demonstrated no understanding or ability to keep the children healthy. Under the circumstances, the juvenile court's finding that an award of permanent custody of 1-L.R. and 2-L.R. was in the best interest of the children was not against the manifest weight of the evidence. Accordingly, Mother's and Father's second assignments of error are overruled.

## III.

**{¶55}** Mother's and Father's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellants.

JENNIFER HENSAL
FOR THE COURT

CALLAHAN, P. J.
CARR, J.
CONCUR.


APPEARANCES:

PAMELA A. HAWKINS, Attorney at Law, for Appellant.

MADELINE LEPIDI-CARINO, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and JACQUENETTE S. CORGAN, Assistant Prosecuting Attorney, for Appellee.

CHRISTINE BOLLMAN, Attorney for the Guardian ad Litem.