[Cite as *In re G.B.*, 2020-Ohio-3220.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

IN RE: G.B.

C.A. No.     19CA011599
                19CA011600

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.     17 JC 53107

DECISION AND JOURNAL ENTRY

Dated: June 8, 2020

---

CALLAHAN, Presiding Judge.

{¶1} Appellants Mother and Father appeal the judgment of the Lorain County Court of Common Pleas, Juvenile Division, that terminated their parental rights and placed the child G.B. in the permanent custody of Lorain County Children Services ("LCCS" or "the agency"). This Court affirms.

I.

{¶2} Mother and Father are the biological parents of G.B. (d.o.b. 1/6/16). Mother has five other children. Father is the biological father of the three youngest of Mother's children: G.B. and that child's two older siblings, C.B. and B.B. Based on concerns regarding the parents' substance abuse issues and inability to care for the children, LCCS removed and initiated cases in the juvenile court as to the older siblings when they were infants. C.B. was ultimately placed in the permanent custody of LCCS in 2009, while B.B. was placed in the legal custody of her paternal grandmother in 2014.

{¶3} Shortly after G.B. was born in 2016, LCCS again became involved with the family based on substance abuse, mental health, and parenting concerns. The agency worked with Mother and Father on a voluntary basis for a year. During that time, Mother used the additional in-home services of a mother-mentor. Although the agency still had concerns, it closed its informal case after a year in large part because the mother-mentor, a mandatory reporter of child dependency, neglect, or abuse, would continue to work with the family. In April 2017, LCCS received a referral alleging that Mother and Father had again begun abusing drugs and/or alcohol. The agency closed that case two months later because it was unable to locate the family.

{¶4} On November 18, 2017, LCCS received another referral, alleging that Mother had walked barefoot in the cold rain to a hospital emergency room around 11:30 p.m. She had a soaking wet G.B. in a stroller with her. Mother appeared to be under the influence of intoxicating substances. Because the agency was unable to contact Father to retrieve the child, LCCS removed G.B. and placed her temporarily at Blessing House. The agency learned that Mother had been drinking and using Xanax when she arrived at the hospital with the child. Accordingly, LCCS filed a complaint alleging G.B. to be a neglected and dependent child.

{¶5} Mother and Father stipulated to the allegations in the complaint, and the child was adjudicated neglected and dependent. By further agreement of the parties, G.B. was placed in the temporary custody of LCCS. The juvenile court adopted the agency's case plan. Both Mother and Father had case plan objectives addressing substance abuse, mental health, and basic needs issues. In addition, Mother was required to engage in parenting skills services. After a year, despite some resistance and noncompliance by Mother and Father, LCCS moved for a first six-month extension of temporary custody, largely based on the parents' ability to maintain stable housing. The juvenile court granted the agency's motion extending temporary custody.

{¶6} Almost six months later, LCCS filed a motion for permanent custody. The agency alleged that G.B. had been in its temporary custody for at least 12 of the past 22 months, that the child could not or should not be returned to Mother and Father, and that an award of permanent custody was in the child's best interest. After a six-day hearing, the juvenile court granted the agency's motion for permanent custody and terminated Mother's and Father's parental rights to G.B. Mother and Father filed separate timely appeals, in which each raises one assignment of error for review. As the parents' assigned errors implicate the same issues, this Court consolidates them for discussion.

II.

### MOTHER'S ASSIGNMENT OF ERROR

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR BY FINDING THAT IT WAS IN THE BEST INTERESTS OF [G.B.] TO BE PLACED IN THE PERMANENT CUSTODY OF [LCCS] DESPITE THE FACT SUCH FINDING WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE.

### FATHER'S ASSIGNMENT OF ERROR

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FOUND THAT IT IS IN THE CHILD'S BEST INTEREST TO GRANT PERMANENT CUSTODY OF THE CHILD TO [LCCS] RATHER THAN PLACE THE CHILD BACK IN THE LEGAL CUSTODY OF FATHER AND/OR EXTEND TEMPORARY CUSTODY. IN DOING SO, THE TRIAL COURT ERRONEOUSLY FOUND THAT EACH PRONG OF THE PERMANENT CUSTODY TEST WAS MET. THE DECISION OF THE TRIAL COURT IS THEREFORE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶7} Mother and Father challenge the juvenile court's judgment awarding permanent custody of G.B. to LCCS on evidentiary grounds. Their arguments are not well taken.

{¶8} Despite the reference to abuse of discretion, it is well settled that "the appropriate standard of review to address the argument that [Mother and Father have] raised is whether the judgment is against the manifest weight of the evidence." *In re J.J.*, 9th Dist. Medina No.

19CA0008-M, 2019-Ohio-2152, ¶ 12, citing *In re T.K.*, 9th Dist. Summit No. 28720, 2017-Ohio-9135, ¶ 7.  When determining whether a permanent custody judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered."  (Internal citations omitted.)  *In re T.K.* at ¶ 7.  When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact."  *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 21.

{¶9}    Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child in a parent's custody has been adjudicated abused, neglected, or dependent on three separate occasions; or the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D).  *See* R.C. 2151.414(B)(1) and (2); *see also In re William S.*, 75 Ohio St.3d 95, 99 (1996).

{¶10}  The juvenile court found that the first prong of the permanent custody test was satisfied on two alternative grounds: that the child cannot be placed with either parent within a reasonable period of time or should not be placed with her parents pursuant to R.C. 2151.414(B)(1)(a); and that G.B. had been in the temporary custody of LCCS for 12 or more months of a consecutive 22-month period pursuant to R.C. 2151.414(B)(1)(d).  The first prong of

the permanent custody test is satisfied if the record supports any one of the alternative findings by clear and convincing evidence. *See In re A.D.*, 9th Dist. Lorain No. 19CA011547, 2020-Ohio-526, ¶ 11. Although both Mother and Father argue that the application of the R.C. 2151.414(E) factors do not support a finding that G.B. cannot or should not be placed in their custody pursuant to R.C. 2151.414(B)(1)(a), neither parent challenges the juvenile court's alternative first-prong finding. Specifically, neither parent disputes that the child had been in the agency's temporary custody for at least 12 of 22 months at the time LCCS filed its motion for permanent custody. The agency expressly asserted that alternative first-prong ground in its motion, and the juvenile court found same. The juvenile court's alternative finding pursuant to R.C. 2151.414(B)(1)(d) is fully supported by the record. Accordingly, this Court need not determine whether the first prong of the permanent custody test was also satisfied pursuant to R.C. 2151.414(B)(1)(a) grounds.

{¶11} The juvenile court was next required to find that an award of permanent custody was in the best interest of G.B. When determining the best interest of a child pursuant to R.C. 2151.414(D), the juvenile court must consider all relevant factors, including the custodial history of the child, the interaction and interrelationships of the child, the child's wishes, the need for permanence in the child's life, and whether any of the factors set forth in R.C. 2151.414(E)(7) to (11) apply to the facts of the case. R.C. 2151.414(D)(1); *In re R.G.*, 9th Dist. Summit Nos. 24834 and 24850, 2009-Ohio-6284, ¶ 11.

Custodial history of the child

{¶12} G.B. remained in the custody of her parents for almost the first two years of her life, although LCCS was involved with the family under a voluntary case plan during the child's first year. A mother-mentor remained involved with the family for some time after the agency terminated its voluntary services. LCCS obtained an emergency order of temporary custody

shortly before G.B.'s second birthday and placed the child at Blessing House for approximately one month. The child was then placed with a paternal cousin, but that placement lasted very briefly. G.B. was then placed in a foster home with a foster mother and foster father, where she remained throughout the almost two-year duration of the case.

Interaction and interrelationships of the child

{¶13} During this case, G.B. has developed a very strong and loving bond with the foster parents. She engages them in play and conversation, and they are responsive. The foster parents have maintained a daily routine for the child. The consistency has alleviated G.B.'s initial tantrums.

{¶14} The foster parents have coordinated with the child's paternal grandmother who has legal custody of B.B. to ensure that G.B. and her older sister are able to visit several times each month. The two sisters have developed a close relationship and enjoy each other's company.

{¶15} G.B. is happy to visit with Mother and Father. It is clear that the parents and child love one another. During visits, the caseworkers and guardian ad litem have routinely observed a lack of engagement by the parents with the child. Mother and Father play the same video at every visit to entertain G.B. The video lasts longer than half of the parents' two-hour visit. Although there is some interaction among the parents and child, it is not unusual for Mother to sit in a corner by herself and color while the child interacts with other visiting families or visitation monitors. At times, after getting angry because of a comment by a caseworker or the guardian ad litem, Mother has left the visitation room for 20 minutes or so. When she returns, she ignores the child for an additional time during the visit. On occasion, Father leaves the visit to get food for the child that the parents forgot to bring, thereby reducing the time the child has to visit with him.

{¶16} G.B. typically seeks help from visitation monitors, even though Mother and Father are nearby. The child often asks to go back home to her foster parents. The guardian ad litem observed that Mother and Father interact more with inanimate objects during visits than with the child. For example, although Father brought a remote-control car to a visit to play with the child, he instead took the batteries out of the car and put them in a clock on the visitation center wall. On another occasion, G.B. asked to play hide and seek. Mother agreed and told Father to count for the child to hide. However, neither parent tried to seek out G.B. after she hid. Accordingly, while the child is comfortable with Mother and Father, G.B.'s interaction with Mother and Father at visits is somewhat limited by the parents' choices.

Child's wishes

{¶17} The four-year-old child was too immature to express her own wishes regarding custody, although she referred to her foster home as home. The guardian ad litem recommended permanent custody in the child's best interest based on the parents' struggles to engage with the child during visitations; the parents' minimization and lack of understanding of their substance abuse issues, mental health issues, and Mother's cognitive deficits; and the child's safety and security in a foster home in which she was thriving with foster parents who wished to adopt the child.

Child's need for permanence

{¶18} G.B. was removed from her parents' home based on historical concerns regarding substance abuse and poor parenting abilities after Mother arrived intoxicated at a hospital late at night with the child in tow. Both parents have a long history with LCCS. Mother's three oldest children (some or all of whom may be emancipated at this time) were each placed in the legal custody of their respective fathers. Mother's and Father's first child together (C.B.) was removed

based on the parents' drug use and inability to provide care for the medically fragile child. C.B. was later placed in the permanent custody of LCCS. The agency also removed Mother's and Father's second child together (B.B.) based on the parents' drug use and inability to provide for the basic needs of the child. B.B. was later placed in the legal custody of her paternal grandmother. Although Father claims to have successfully parented a now-30-something-year-old child, there was no evidence regarding that son other than that LCCS investigated him for placement of G.B. and determined him to be inappropriate.

{¶19} Notwithstanding long-term historical concerns, LCCS developed a case plan with the goal of reunification. Both parents were required to address substance abuse, basic needs, and mental health issues. In addition, Mother was required to address cognitive functioning and parenting skills issues. The caseworker emphasized that the case plan objectives were not merely a checklist, but rather the purpose was for Mother and Father to develop an understanding of their issues and to make changes in their behaviors that reflect that understanding.

{¶20} Mother and Father were both reticent and at times belligerent and uncooperative. They frequently expressed a lack of understanding regarding the need for the agency's involvement. Both insisted that they were already good parents, having raised other children.

{¶21} As to substance abuse objectives, Mother moved from one drug treatment program to another, self-terminating when she no longer liked a program. The agency caseworker testified that Mother self-terminated services with one provider after a "questionable" drug screen. Both parents were inconsistent when discussing substance abuse issues with service providers, at times denying any issues, and at others admitting prior use of opiates, cocaine, and alcohol. Mother and Father both believed that alcohol use was not a problem for them because it is legal.

{¶22} Mother and Father are both prescribed Suboxone. Although the substance is used to control opiate addiction, Mother and Father informed caseworkers that they used it for back pain, not addiction. At the permanent custody hearing, Father finally admitted that he uses Suboxone to address addiction. He denied that Suboxone is a drug, however, because it is prescribed. Both Mother and Father continued a regimen of long-term high doses of Suboxone, while LCCS wanted to see them start weaning off the substance. Father once told a caseworker that he was not concerned about not being able to receive prescription Suboxone at some point because he knew where he could buy it on the street.

{¶23} Mother and Father asserted that they regularly participate in AA and/or NA groups. Mother was unable to provide proof of attendance during the past four months, but she claimed that she simply forgot to bring her signature sheet to meetings. Mother claimed to have completed all 12 steps of the AA program with her sponsor, but she was unable to name any of the steps. Father claimed to have a sponsor, but he refused to identify him. Father also testified that he participates in NA because he does not have a problem with alcohol, and that NA does not have a 12-step program. Instead, participants just talk at meetings. Mother's AA sponsor testified that NA in fact has the same 12-step program as AA.

{¶24} Although Mother and Father claimed to have worked on their substance abuse case plan objectives, neither evidenced an understanding of the significance of their problems. Moreover, Father failed to recognize the impact of Mother's substance abuse issues on her ability to care for the child. Mother's relapse that resulted in G.B.'s removal occurred when she used Xanax without a verified prescription and drank three glasses of wine in response to an argument with a neighbor. Father described Mother's used of alcohol that night as merely a "slip" and not

an event that affected her sobriety. Mother's AA sponsor testified, however, that a sobriety date implicates the use of "no mind or mood altering substances" since that time.

{¶25} In addition to the parents' lack of understanding as to the significance of their substance abuse issues and the historical impact those issues have had on their parenting abilities, LCCS caseworkers expressed serious concerns about Mother's and Father's lack of prioritizing the child and her needs. For the first year of the case, the parents attended only 23 of the 43 visits offered, citing other appointments, problems with transportation, and too much going on in their lives as excuses. During the next six months, Mother and Father attended 24 of the 35 visits offered, but they were often late to arrive and early to leave. During that period, Mother and Father requested a second weekly visit, which the agency added at a 9-11 a.m. time slot. After the parents failed to appear for the first four of those additional visits, however, LCCS cancelled the second weekly visitation opportunity. Despite the parents' request for additional time with the child, Father was angry about the scheduled time and told the caseworker that he and Mother were not early risers and had no reason to get up that early. When the caseworker told Father that she was giving the parents a reason to get up, Father remained angry and told her that "they [Mother and Father] have a life."

{¶26} Mother's and Father's attendance at visits improved during the last five months of the case, when they attended 28 of 31 offered visits. The parents cancelled one visit because they were upset that it could not take place in their chosen location in the community. They cancelled another visit, claiming that Mother had a conflicting medical appointment. When the caseworker made an unannounced visit to the parents' home during the time scheduled for visitation, however, the parents were home, and Mother was sleeping.

{¶27} Despite being offered the opportunity to attend the child's medical and dental appointments, Mother and Father never did. They further never asked about the outcome of any of those appointments. Mother and Father agreed to attend one appointment but changed their minds when they learned that the caseworker would also be there. LCCS once scheduled a medical appointment for the child for immediately after a visit so the parents could easily attend. Mother and Father declined because they did not receive more than 24 hours' notice.

{¶28} The agency had ongoing concerns regarding Mother's cognitive functioning. Mother completed a psychological assessment that addressed her cognitive functioning. All four scores that made up her composite IQ of 64 were extremely low. Her working memory was her strength, but even that score was significantly lower than normal. Mother suffers from severe deficits in verbal skills and processing speed, scoring in the first percentile or lower in these areas. There was reference at the permanent custody hearing to Mother's very delayed responses to questioning when she testified.

{¶29} The psychologist who administered the assessment testified that Mother's intellectual deficits have a significant effect on her day-to-day functioning. Her IQ will never improve, and her deficits are permanent. The psychologist opined that any substance abuse in conjunction with Mother's cognitive functioning issues would present a major cause for concern regarding her judgment. The psychologist further testified that Mother would need the daily support of someone who is both sober and of at least low average intelligence to assist her in making parenting decisions. For example, while Mother would understand that the child was in pain after being injured somehow, Mother would not be able to discern whether the child's injuries required medical attention or whether the injuries could be treated at home without medical intervention.

{¶30} Caseworkers were all concerned that Father could not be an adequate support system for Mother. Father did not believe that Mother had any intellectual deficits. He believed that Mother could read and write "okay" even though the psychologist and Mother's AA sponsor both testified that they had to read materials to Mother to help her understand. Moreover, the caseworkers and guardian ad litem did not believe that Father could or would assert himself and challenge any decisions made by Mother, given Mother's strong personality and Father's history of acquiescing to her choices.

{¶31} As for basic needs, Mother and Father had lived in five homes since LCCS initiated G.B.'s case. Although they had once been evicted, the parents had secured stable housing. Everyone who saw the home testified that it was spotlessly clean.

{¶32} Although Mother and Father believed that they were able to provide for their own and a child's basic needs, the evidence raised doubts. Mother's and Father's sole source of income is derived from Social Security Disability payments totaling just under $1,100 per month. They also receive $218 per month in food stamps. They are not enrolled in any utility assistance programs. Rent and Father's Suboxone costs alone total $900 per month. Other monthly financial obligations include electricity, gas, car insurance, phones, and a $61 child support obligation for Father. In addition, both parents smoke. Mother believes she spends $30 per month on tobacco and rolling papers. Mother oversees the family finances and testified that she has a surplus of $300 each month after paying all expenses. Father believes that the family breaks even each month.

{¶33} The clear and convincing evidence demonstrates that Mother and Father are not capable of providing a safe and stable home for G.B. in a timely manner. Despite historical issues in many areas, Mother and Father still demonstrate no understanding of the concerns of all professionals involved in this case. Both parents believe that they are competent and capable of

caring for the child and that they have no limitations. Father fully supports Mother and denies that her cognitive and substance abuse issues have impacted her ability to parent. Father has shown no ability to stand up to Mother and challenge her judgment.

{¶34} Although neither parent had any positive drug screens during this case, reasonable concerns remain. Father's drug assessment indicated that further assessment of his history and present use was necessary because of Father's mistrustful demeanor during the assessment. Both parents have had multiple relapses over the years, often resulting in the loss of custody of a child. Mother's relapse that initiated this case occurred when she got angry at a neighbor. Many witnesses testified that Mother gets angry when she hears something she does not like.

{¶35} Given Mother's and Father's lack of understanding of the impact that substance abuse, mental health/cognitive functioning, and deficient parenting skills continue to play in their lives, the parents are unable to provide a safe and stable permanent home for the child. They frequently were unable to coordinate appointments and other obligations in a way to allow them to visit with the child on a consistent basis. In fact, a caseworker testified that the more responsibility she gave Mother and Father, the less able they were to meet their obligations. Moreover, the parents routinely demonstrated a refusal to prioritize G.B. to put her needs above their own, e.g., choosing to sleep late instead of taking advantage of another opportunity to visit with the child. The foster mother testified that G.B. is up at 6:00 a.m. and ready to play. In the meantime, Mother and Father were unable to rouse themselves to make a 9:00 a.m. visit at a center five minutes from their home. A review of the evidence demonstrates that Mother and Father are unable to provide the permanence necessary in the best interest of the child.

{¶36} On the other hand, G.B. has thrived in her foster home. She is healthy and happy. She has no delays or medical issues, except for some respiratory issues requiring the use of an

inhaler. Those issues arise when the weather turns cold or when she is exposed to irritants. As both parents smoke, they would have to be able to recognize the child's need for treatment and understand how to use the inhaler. Given Mother's cognitive deficits and Father's hesitancy to intervene, the child's health may likely be impacted.

{¶37} The foster parents desire to adopt G.B. The foster mother testified that she and her husband are willing to continue to facilitate visits between G.B. and her sister B.B. and the paternal grandmother. In addition, the foster parents are willing to allow Mother and Father to maintain a relationship with the child, as long as that could be done without trauma to the child or putting any person at risk. The foster mother was optimistic about facilitating those visits, however. G.B., who has been in foster care for two years, needs the permanence that Mother and Father unfortunately cannot provide.

R.C. 2151.414(E)(7) to (11) factors

{¶38} Mother's and Father's parental rights previously had been involuntarily terminated as to an older sibling (C.B.) of the child. R.C. 2151.414(E)(11).

Conclusion

{¶39} Based on a thorough review of the record, this is not the exceptional case where the finder of fact clearly lost its way and created a manifest miscarriage of justice by terminating Mother's and Father's parental rights and granting LCCS' motion for permanent custody. Mother and Father made some effort to participate in various case plan services, although much participation was sporadic or delayed. The lack of the parents' understanding regarding their limitations and issues prevented them from embracing services and developing skills necessary to parent the child. Mother and Father frequently demonstrated the inability to coordinate their schedules to both meet their own obligations and attend to the care of G.B. They further often

failed to make the child a priority, missing visits and G.B.'s appointments. Under these circumstances, the juvenile court's judgment awarding permanent custody to LCCS was not against the manifest weight of the evidence.

{¶40} Finally, Mother argues that LCCS should have referred her to the Lorain County Board of Developmental Disabilities ("LCBDD") given the agency's concern that Mother's cognitive deficits impacted her ability to parent a child. As a practical matter, she argues that the juvenile court's finding that the agency used reasonable efforts was against the manifest weight of the evidence. To the extent that Mother challenges the permanent custody judgment based on a lack of reasonable efforts by LCCS, her argument fails.

{¶41} R.C. 2151.419 addresses when the juvenile court must determine whether the child protection agency has made reasonable efforts towards reunification of a child with her parents. It is well settled that R.C. 2151.419 does not require a reasonable efforts determination based on evidence at the permanent custody hearing unless the agency had not earlier established that it had made reasonable efforts. *In re L.R.*, 9th Dist. Summit Nos. 29266 and 29271, 2019-Ohio-2305, ¶ 14, quoting *In re J.W.*, 9th Dist. Summit Nos. 28966 and 28976, 2018-Ohio-3897, ¶ 6 (superseded in part on other grounds), and *In re A.C.-B.*, 9th Dist. Summit Nos. 28330 and 28349, 2017-Ohio-374, ¶ 22; *see also In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 41-43 (concluding that a reasonable efforts determination is only necessary at the permanent custody hearing if the agency has not demonstrated that it used reasonable efforts to facilitate reunification of the child with parents prior to that time).

{¶42} In this case, the juvenile court found that LCCS had made reasonable efforts to prevent the continued removal of the child from her home at the initial and all subsequent dispositional and review hearings prior to the permanent custody hearing. While represented by

counsel, Mother and Father failed to object to any prior reasonable efforts determinations. Moreover, both parents, along with their attorney, in fact stipulated to such determinations and signed the magistrate's decisions in the section designated for parties' approvals. Accordingly, Mother has forfeited any challenge to LCCS' use of reasonable efforts on appeal, save for a claim of plain error. *See In re L.R.* at ¶ 18. To establish plain error, an appellant "must demonstrate not only trial court error but also that the error resulted in prejudice to [her] defense." *In re F.B.*, 9th Dist. Summit Nos. 28690 and 28985, 2019-Ohio-1738, ¶ 30. Although Mother notes plain error in the recitation of her assignment of error, she makes no argument as to how the lack of a referral to LCBDD prejudiced her, particularly given the evidence that no services could ever increase Mother's cognitive functioning level.

{¶43} Based on the above discussion, the juvenile court's judgment is supported by clear and convincing evidence. Mother's and Father's separate assignments of error are overruled.

III.

{¶44} Mother's and Father's sole but separate assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellants.

LYNNE S. CALLAHAN
FOR THE COURT

CARR, J.
CONCURS.

HENSAL, J.
DISSENTING.

{¶45} I respectfully dissent. The majority correctly concludes that the first prong of the permanent custody test was satisfied by the fact that G.B. remained in the temporary custody of the agency for 12 or more months of the consecutive 22 months preceding the agency's motion. However, I do not agree that LCCS satisfied the second prong of the test. I would not conclude that the agency proved by clear and convincing evidence that it is in G.B.'s best interest that she be placed in the permanent custody of LCCS and that her familial ties to her parents be permanently severed.

{¶46} Clear and convincing evidence is evidence that will "'produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re L.R.*, 9th Dist. Summit Nos. 29266 and 29271, 2019-Ohio-2305, ¶ 24, quoting *In re Adoption of Holcomb*,

18 Ohio St.3d 361, 368 (1985). In looking at whether the agency met its burden under the manifest weight of the evidence review, *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20, we must still keep the level of the evidence required in mind.

{¶47} The juvenile court issued a thorough judgment entry after a six-day hearing, at which all parties presented evidence and made well-reasoned arguments. While the quantum of evidence inured in the favor of LCCS, there was neither clear nor convincing evidence that the best interest of the child required an award of permanent custody.

{¶48} It is undisputed that Mother and Father have a long history of child welfare involvement regarding multiple children. Both parents admitted that their past substance abuse issues precipitated agency involvement. This case too was initiated after Mother's lapse in judgment while under the influence of intoxicating substances. However, Mother's substance use was an isolated event. Except for prescribed Suboxone, neither parent tested positive for any drugs or alcohol throughout the duration of the case. Nevertheless, LCCS remained entrenched in concerns it struggled to articulate, while Mother and Father remained extremely distrustful of any agency action and perhaps genuinely unclear regarding the agency's ongoing involvement. I believe that both sides in this case were predisposed to their respective positions, which negatively impacted the coordination and cooperation necessary to illuminate the issues properly. Given the family's circumstances as they existed relative to G.B., instead of viewing the situation exclusively through an historical lens, I would conclude that there was not clear and convincing evidence to show that it is in this child's best interest to terminate her legal relationship with Mother and Father. Accordingly, I would reverse the juvenile court's judgment and return G.B. to the legal custody of her parents.

APPEARANCES:

LINDSAY K. NICKOLLS, Attorney at Law, for Appellant.

JUSTIN MILLER, Attorney at Law, for Apellant.

DENNIS P. WILL, Prosecuting Attorney, and JENNIFER A. TOMECHKO, Assistant Prosecuting Attorney, for Appellee.

LINDA O'CONNOR, Guardian ad Litem.