[Cite as *In re G.A.*, 2023-Ohio-643.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

IN RE: :

   G.A., et al. : CASE NO. CA2022-11-079

: O P I N I O N
3/3/2023

:

:

:

APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. 2020 JC 05250, 2020 JC 05251, and 2020 JC 05252

Bazeley Law, and Christopher Bazeley, for appellant.

Mark J. Tekulve, Clermont County Prosecuting Attorney, and Nicholas Horton, Assistant Prosecuting Attorney, for appellee.

**BYRNE, J.**

{¶1}   Appellant ("Mother"), the biological mother of "Gia," "John," and "Joshua," appeals the decision of the Clermont County Court of Common Pleas, Juvenile Division, granting permanent custody of the children to the Clermont County Department of Job and Family Services ("CCDJFS").[1]  For the reasons outlined below, we affirm the juvenile court's

---

1. "Gia," "John," and "Joshua" are pseudonyms, adopted in this opinion for purposes of privacy and readability. *See In re D.P.*, 12th Dist. Clermont Nos. CA2022-08-043 and CA2022-08-044, 2022-Ohio-4553, fn. 1.

decision.

## I. Factual and Procedural Background

{¶2} CCDJFS has a lengthy history with the family, stemming from concerns related to domestic violence, drug use, and Mother's mental health. Prior to CCDJFS's most recent involvement, the children lived with Mother and she was their primary caretaker. Gia's father is not involved in her life or the instant proceedings, while John and Joshua's father was imprisoned for domestic violence against Mother for the duration of the case and is also not involved in these proceedings. Mother also has an older son, who is not involved in the instant action and was removed from Mother's care in late February 2020.

{¶3} Relevant to the present matter, CCDJFS became involved with Gia, John, and Joshua in February 2020 after learning that Mother had received a mental health diagnosis and refused to admit herself into the hospital as directed. There was also an incident where Mother had called the police in response to a domestic violence situation with her then-husband. When officers arrived at the home, they were presented with a "plate of methamphetamine" and allegations that both Mother and her husband were using drugs. The children were removed from the home and Mother and her husband were arrested and taken to jail. At the time of their removal from Mother's care, Gia was five months old, John was two years old, and Joshua was three years old.

{¶4} Based upon the above, CCDJFS filed a complaint alleging Gia, John, and Joshua were dependent children and requested temporary custody of the children. After a hearing, the juvenile court awarded temporary custody of the children to CCDJFS and appointed a guardian ad litem. Shortly after their removal from Mother's care, the children were placed in a foster home, where they remained for the duration of the case.

{¶5} With regard to Gia, Mother admitted the allegations of the complaint and the child was adjudicated dependent on March 12, 2020. A hearing was held on April 7, 2020

regarding John and Joshua's complaints. As a result of that hearing, John and Joshua were also adjudicated dependent, and all three children continued their placement in the foster home.

{¶6} A case plan was created for Mother with a goal of reunification. According to the case plan, CCDJFS was concerned with Mother's untreated mental health issues, her ongoing substance abuse issues, and her history of relationships with partners who engaged in domestic violence in the home. CCDJFS was also concerned regarding Mother's ability to meet her children's needs, including providing food, clothing, shelter, and appropriate supervision. In order to address CCDJFS's concerns, the case plan required Mother to engage in mental health and substance abuse treatment; to "actively participate in therapy sessions that help her build the skills she needs to make better choices for herself and her children" and would help her "learn to recognize the patterns of her partner choice to ensure that her children's needs are being placed before her own;" and to engage in consistent visitation with the children upon her release from jail.

{¶7} Mother made minimal progress on her case plan services, and she failed to adequately address CCDJFS's concerns regarding her housing, mental health, and substance abuse issues. From March to November 2020, Mother only attended her scheduled weekly visits with the children 50 percent of the time. From November 2020 to April 2021 her attendance improved slightly, but she still only attended 60 percent of scheduled weekly visits. Mother's multiple incarcerations in Ohio and Mississippi resulted in long periods in which Mother had no contact at all with the children. Specifically, the record reflects Mother was incarcerated in Clermont County in April 2021 and was later transferred to a county jail in Mississippi in May 2021. Mother was released in July 2021 and returned to Ohio in August 2021. Mother was reincarcerated shortly thereafter and was transferred to a county jail in Mississippi in January 2022. Mother did not visit with the

children while she was incarcerated.

{¶8} Based upon Mother's various incarcerations and failure to engage in case plan services, CCDJFS moved for two extensions of temporary custody of the children. The juvenile court granted CCDJFS's first extension request in February 2021 and granted CCDJFS's second extension request in August 2021.

{¶9} On February 1, 2022, CCDJFS moved for permanent custody of the children. Mother was released from the Mississippi county jail shortly thereafter and reported living in a sober living home in Mississippi. At that point, Mother was on probation in Mississippi, but testified that she intended to move to Ohio and to request that her probation be moved to Ohio too. After her release, Mother traveled to Ohio on a handful of occasions to engage in visitation with the children and engaged in other services, including drug treatment, as directed by the case plan.

{¶10} In April 2022, a trial was held before a magistrate. At trial, the magistrate heard testimony from an attorney with the Clermont County Child Support Enforcement Agency, two caseworkers from CCDJFS, the children's foster mother ("Foster Mother"), an adoption assessor, and Mother. The children's guardian ad litem did not testify but was present during trial and filed a report with the juvenile court recommending that permanent custody be granted to CCDJFS.

{¶11} On July 11, 2022, the magistrate issued a decision granting permanent custody of the children to CCDJFS. In his decision, the magistrate summarized the trial testimony and applied the R.C. 2151.414(B)(1) two-part permanent custody test. As for the first part of the two-part test, the magistrate found that a grant of permanent custody to CCDJFS was in the children's best interests. As for the second part of the two-part test, the magistrate found that (1) the children had been in the temporary custody of CCDJFS for at least 12 months of a consecutive 22-month period (the "12 of 22" finding) and (2) that

- 4 -

the children had been abandoned by their parents. Having found that both parts of the two-part test were satisfied, the magistrate granted CCDJFS's motions for permanent custody.

{¶12} Mother objected to the magistrate's finding that permanent custody was in the children's best interests, arguing that the magistrate's decision to grant permanent custody to CCDJFS was against the manifest weight of the evidence. Mother did not dispute the magistrate's "12 of 22" finding or its finding that the children had been abandoned by Mother. After a hearing and after conducting an independent review of the evidence, the juvenile court overruled Mother's objections and affirmed the magistrate's decision in its entirety.

**II. Legal Analysis**

{¶13} On appeal, Mother raises the following sole assignment of error:

{¶14} THE TRIAL COURT'S DECISION TERMINATING [MOTHER'S] PARENTAL RIGHTS IS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE.

{¶15} In her brief, Mother argues the juvenile court erred in concluding that terminating Mother's parental rights was in the best interests of the children.[2] Although Mother's assignment of error claims the juvenile court's decision is not supported by clear and convincing evidence, the body of the assignment of error appears to challenge the weight given to certain best interest factors by the juvenile court. As such, we construe her assignment of error as an argument that the juvenile court's decision was not only

---

2. We note that, although Mother's notice of appeal references all three children, Mother's brief only addresses the juvenile court's decision awarding permanent custody of Gia to CCDJFS. *See, e.g.,* Appellant's Brief pg. 4 ("As a result, the trial court erred when it terminated [Mother's] parental rights to [Gia]."). In its appellee brief, CCDJFS brought counsel's omission of John and Joshua to the attention of this court. In Mother's reply brief, counsel stated that "the arguments raised in [Mother's] Appellant Brief are equally applicable to all three [children]." It is well settled that arguments cannot be raised for the first time in a reply brief. *In re A.V.*, 12th Dist. Warren Nos. CA2021-04-030 thru CA2021-04-033, 2021-Ohio-3873, ¶ 36, fn. 3*; see also In re C.P.*, 10th Dist. Franklin No. 08AP-1128, 2009-Ohio-2760, ¶ 66. However, given the gravity of the juvenile court's decision, and the important nature of permanent custody proceedings, we will address Mother's arguments as if they pertain to all three children.

unsupported by clear and convincing evidence, but also against the manifest weight of the evidence. *See In re D.P.*, 12th Dist. Clermont Nos. CA2022-08-043 and CA2022-08-044, 2022-Ohio-4553, ¶ 19. We will address that argument below after summarizing the applicable legal standard.

## A. Applicable Law

{¶16} Before a natural parent's constitutionally protected liberty interest in the care and custody of his or her child may be terminated, the state must prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.P.*, 12th Dist. Preble No. CA2021-11-017, 2022-Ohio-1155, ¶ 11. Under R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re K.P.*, 12th Dist. Preble No. CA2021-11-016, 2022-Ohio-1347, ¶ 17. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, using, in part, the factors of R.C. 2151.414(D). *In re M.H.*, 12th Dist. Clermont Nos. CA2021-08-047, CA2021-08-048, and CA2021-08-049, 2022-Ohio-48, ¶ 35. Second, the juvenile court must find that one of the circumstances set forth in R.C. 2151.414(B)(1)(a) to (e) apply. *In re R.B.*, 12th Dist. Butler Nos. CA2022-01-003 and CA2022-01-004, 2022-Ohio-1705, ¶ 31. Those circumstances include, but are not limited to: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of one or more public children services agencies for 12 or more months of a consecutive 22-month period; and (4) when the previous circumstances do not apply, the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the parents. R.C. 2151.414(B)(1)(a), (b), (c), and (d). Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re C.S.*, 12th Dist. Clinton No. CA2020-04-006, 2020-Ohio-4414, ¶ 16.

{¶17} An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination. *In re R.F.*, 12th Dist. Warren Nos. CA2021-06-052, CA2021-06-053, and CA2021-06-056, 2021-Ohio-4118, ¶ 7. This court will therefore reverse a juvenile court's decision to grant permanent custody only if there is a sufficient conflict in the evidence presented. *In re M.N.*, 12th Dist. Fayette No. CA2021-07-015, 2021-Ohio-4042, ¶ 19.

{¶18} Even if there is sufficient evidence to support the juvenile court's decision, an appellate court may nevertheless reverse a permanent custody judgment if it finds the judgment to be against the manifest weight of the evidence. *In re F.S.*, 12th Dist. Fayette Nos. CA2020-08-011 and CA2020-08-012, 2021-Ohio-345, ¶ 61. To determine whether the judgment was against the manifest weight of the evidence, an appellate court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *In re K.M.*, 12th Dist. Butler Nos. CA2020-03-031, CA2020-03-032, and CA2020-03-033, 2020-Ohio-3602, ¶ 25. The presumption in weighing the evidence is in favor of the finder of fact, which we are especially mindful of in custody cases. *In re R.K.*, 12th Dist. Warren Nos. CA2021-03-027 and CA2021-03-028, 2021-Ohio-3074. Therefore, if the evidence is susceptible to more than one construction, the reviewing court is bound to give it that interpretation which is most favorable and consistent with the verdict and judgment. *In re D.S.*, 12th Dist. Clinton Nos. CA2021-10-030 and CA2021-10-031, 2022-Ohio-998, ¶ 63.

### B. First Part of the Permanent Custody Test: Best Interest Analysis

{¶19} R.C. 2151.414(D)(1) provides that in considering the best interest of a child in

a permanent custody hearing, a juvenile court must consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

*In re B.L.*, 12th Dist. Butler Nos. CA2017-09-147 and CA2017-09-148, 2018-Ohio-547, ¶ 37. A juvenile court may also consider any other factors it deems relevant to the child's best interest. *In re A.J.*, 12th Dist. Clermont No. CA2018-08-063, 2019-Ohio-593.

{¶20} As stated above, the first best interest factor is "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child." R.C. 2151.414(D)(1)(a). Here, the juvenile court considered the children's relationships with their foster family, Mother, and Mother's oldest son, but concluded their relationships with their foster family have had the most significant effect on the children. After our review, we agree with the juvenile court's conclusion.

{¶21} Regarding the children's relationships with their foster family, the testimony at trial revealed that the children's foster home consists of Foster Mother, her two adopted

daughters, and two additional foster placements. The children are comfortable in their foster home and have bonded with their foster family. According to Foster Mother, the children have also bonded with her long-term boyfriend, who they refer to as "Dad" and consider a father figure.[3] The children refer to Foster Mother as "Mom," and to her adopted daughters as "sisters." The family engages in group outings, which the children enjoy, and the children quickly bonded with the other foster children in the home.

{¶22} In addition to her family's bond with the children, Foster Mother described her efforts in tending to the children's various behavioral, health care, and mental health needs. At the time of their placement, the children were very angry and aggressive. John and Joshua would not sleep and Gia struggled to eat without throwing up. Throughout their placement with Foster Mother, the boys have struggled to maintain placement in their preschool programs due to behavioral issues and have been diagnosed with ADHD, which requires medication. In the month and a half before trial, Gia began demonstrating self-harming behavior, including pulling her hair, as well as biting and hitting herself, which is uncommon for a child of her age. Foster Mother explained that these behaviors exhibit themselves during temper tantrums. In light of these issues, all three children were evaluated and receive therapy services from either Help Me Grow or Children's Hospital. At the time of trial, Foster Mother believed the children have had "ups and downs" since their placement, but are "sweet children" that are making real progress on their behavioral issues, despite ongoing concerns.

{¶23} Regarding the children's health issues, Joshua suffers the most severely, including engaging in three "sleep study clinics" at Children's Hospital, partaking in the "GI clinic," and attending a pulmonary group. Joshua also has appointments for optometry,

---

3. Foster Mother's boyfriend does not live with Foster Mother and her children.

ophthalmology, and psychiatry. Given the severity of his ailments, Joshua attends appointments at Children's Hospital every other week. John has similar, but less severe, health problems. According to Foster Mother, John partakes in two of the sleep study clinics, and is "involved with GI, psychiatry and optometry." John's health issues require visits to Children's Hospital once or twice a month. Aside from recent "GI issues," which Foster Mother is monitoring, Gia's medical issues are "more fluid," and arise on an "as needed" basis. For example, Gia required a cranial band for six months due to a genetic condition impacting the growth of her head, and required the removal of a growth on her toe that was painful and potentially cancerous.

{¶24} After describing the above, Foster Mother testified that she believes she does and can meet the needs of the children and that, due to the flexibility of her schedule, she can attend meetings at the boys' school and any medical appointments the children may have. Foster Mother further explained that she has many resources in place for the children inside and outside the home, including "trauma training," as well as training to work with children that have intensive special needs. According to Foster Mother, if CCDJFS were granted permanent custody, she intended to adopt the children. Thus, the record indicates that Foster Mother is committed to the children and that her relationship with them has had a positive effect on their lives.

{¶25} With respect to the children's relationship with Mother, the testimony at trial revealed that the children are bonded with Mother, though their relationship has been inconsistent for much of their lives. According to the initial caseworker assigned to the children's case, Mother interacted well with the children and showed appropriate interaction and affection during her visits with them. However, due to her various incarcerations, there were significant periods of time, including from April 2021 until February 2022, when Mother had no visitation with the children. The record also reflects that after visits resumed with

Mother in February 2022, the children began "relapsing with some of the [negative] behaviors." At that point the boys began demonstrating violent outbursts, were unable to regulate their feelings, and began attacking other children at school. Similar concerns were described in the guardian ad litem report, wherein the guardian ad litem indicated the children were well behaved during visits with Mother but had melt-downs before and after visit days. Visits with Mother are most stressful for the oldest child, Joshua, who sometimes indicates he misses Mother, but other times indicates he does not wish to see her.

{¶26} As noted by the magistrate in his decision, Mother's history of incarceration and residency in Mississippi has prevented her from having any stable and consistent relationship with her children. Although Mother testified she intends to relocate to Ohio for her children, she resided in Mississippi at the time of trial and was relying on bus transportation to Ohio for occasional in-person visits with her children, plus virtual visits. Mother offered no evidence of a stable housing option in Ohio at the time of trial, aside from her testimony that she arranged an assessment with a long-term, residential, drug treatment facility in Columbus, Ohio. But this arrangement was a mere possibility. There is also no evidence that Mother would be successful in transferring her Mississippi probation to Ohio, which would be necessary for her relocation. Mother merely testified about her belief that her probation officer would pursue an "Interstate Compact" transfer of her probation to Ohio. Mother's testimony amounts to mere speculation about a possible transfer to Ohio. Mother also speculated that the children may be able to live with her at one or more of the housing options (including a sober living facility) that she was pursuing in Ohio. As a result, it is unclear if Mother could provide a stable home for the children in Ohio in the near future. This is problematic, as Mother's return to Ohio is crucial to solidifying her relationship with the children.

{¶27} On appeal, Mother notes that the children are bonded with her and that her

interactions with them have improved over time. However, it is well established that permanent custody is not contrary to a child's best interest simply because a parent loves their child and the two share a strong bond. *In re S.H.*,12th Dist. Butler Nos. CA2014-12-259 and CA2015-01-008, 2015-Ohio-1763, ¶ 24. Rather, it is merely a factor to be considered in the best interest analysis. *Id.* Here, the record demonstrates that, despite the love Mother has for her children, she cannot provide a consistent and stable parent-child relationship with her children at this time.

{¶28} The second best interest factor is "the wishes of the child, as expressed by the child or through the child's guardian ad litem, with due regard to the maturity of the child." R.C. 2151.414(D)(1)(b). Here, the juvenile court concluded that the children were too young to express their wishes when considering their maturity levels. Instead, the juvenile court relied upon the guardian ad litem's recommendation that permanent custody be granted to CCDJFS. The juvenile court noted that, despite Joshua's age of six years old, he was unable to express his wishes to the guardian ad litem in a meaningful way. This is supported by the record, where the guardian ad litem's report indicates Joshua would say he missed Mother on occasion, and would other times become defiant and not want to see her.

{¶29} Though the guardian ad litem did not testify at trial, the guardian ad litem was present at the trial and submitted her report and recommendation prior to trial. There is no evidence in the record, nor does Mother claim on appeal, that she did not receive the report or was otherwise prevented from cross-examining the guardian ad litem regarding the report's contents. *In re Sherman*, 3d Dist. Hancock Nos. 5-04-047 thru 5-04-050, 2005-Ohio-5888, ¶ 30 (indicating a guardian ad litem "need not testify before the report can be considered," but the guardian ad litem "must be available for cross-examination by the parties"). Accordingly, we conclude the juvenile court did not err in relying upon the

guardian ad litem's report and recommendation when considering the children's wishes.

{¶30} The third best interest factor is "[t]he custodial history of the child." R.C. 2151.414(D)(1)(c). Here, the children lived with Mother and she was their primary caretaker for the first five months of Gia's life and the first two or three years of John and Joshua's lives. However, the children were then placed in the custody of CCDJFS and the juvenile court found the children have been in the temporary custody of CCDJFS for a period of 12 or more months of a 22-month period. Mother does not dispute the juvenile court's finding and, as we discuss in detail below, such a finding is supported by the record. In fact, by the time of trial the children had been in the custody of Foster Mother for more than two years, which constitutes most of Gia's life and a large part of John and Joshua's.

{¶31} The fourth best interest factor is the children's "need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." R.C. 2151.414(D)(1)(d). In analyzing this factor, the juvenile court found that Mother is not in a position to provide for her children and their special needs. The juvenile court also noted its concerns regarding Mother's ability to remain sober or free from domestic violence, as well as the unknown details of Mother's potential return to Ohio.

{¶32} On appeal, Mother argues the juvenile court did not consider that she had options for suitable housing upon her return to Ohio, and that she had a secure income in the form of $1,400 monthly benefits from the Veterans Administration. However, a review of the magistrate's and juvenile court's decisions plainly reveals that both considered these facts in their analyses, but gave greater weight to other facts of the case.

{¶33} Regarding Mother's housing, the magistrate noted that, although Mother claimed to have a few options for housing in Ohio, there was no proof of that beyond Mother's testimony. Mother offered only possibilities. Notwithstanding Mother's failure to

provide proof of housing, the magistrate was particularly concerned that none of the housing options suggested by Mother were located in Cincinnati, where the children had been treated by numerous doctors for two years. These concerns are echoed in the juvenile court's decision and are supported by the record. For example, Mother testified she intended to enter a long-term treatment facility in Columbus, Ohio, but did not elaborate on her ability or plan to tend to her children's medical needs from such a distance. Instead, Mother indicated she would meet the children's significant special needs in the "same way that [she] always did"—apparently not recognizing that the children were removed from her custody in the first place because she was *not* meeting the children's needs. Mother also could not recall the location of the alternative treatment center that she would try to enter if the first option did not work out.

{¶34} The record indicates that Mother has not demonstrated the stability and consistency necessary to provide a healthy environment for the children. This includes her ability to remain sober while free from incarceration. At trial, the initial caseworker handling the children's case testified that between April 2020 and March 2021, Mother had started and withdrew from more than six drug treatment programs. At the time, Mother reported various reasons for ceasing treatment, including statements that the program "wasn't right for her" and that there were drugs in the program. At trial, however, Mother indicated her decision to stop treatment was due to her active drug use at the time.

{¶35} Although Mother testified that she had been sober since September 2021, approximately seven months at the time of trial, CCDJFS remained concerned regarding Mother's continued sobriety. Mother testified she was on probation in Mississippi which required her to "not get in trouble with the law anymore" and to "stay drug free." In order to achieve this, Mother admitted herself into a drug treatment facility in Mississippi that she loved and claimed that she was "doing great." Notwithstanding this progress, a caseworker

from CCDJFS indicated that Mother's progress was too little, too late in this case. That is, according to the caseworker, Mother's progress since February 2022 was a "very small amount of time given the length" of this case, and it would take "a long time before" Mother could demonstrate the stability and consistency necessary to provide a healthy environment for the children. A second caseworker testified that Mother would not be able to meet the needs of the children due to what Mother has "on her plate and needing more stability and consistency" for herself.

{¶36} The record reflects that Mother lacks stability and has historically struggled to remain sober and free from incarceration. Thus, although Mother at the time of trial had been actively working on her case plan since her release from jail in February 2022, and had allegedly been sober for seven months at the time of trial, we agree that Mother has not demonstrated the stability necessary to provide for the children. This is especially true given Mother's acknowledgment that much of her return to Ohio remained uncertain and speculative at the time of trial. Specifically, although Mother had contacted a long-term treatment center in Ohio, her admittance to that program was not complete at the time of trial. Additionally, Mother did not disclose the terms of her probation to the juvenile court and was not scheduled to discuss with her Mississippi probation officer the transfer of her probation to Ohio until the week following trial. Notably, a caseworker testified she had been unsuccessful in her attempts to verify the terms of Mother's probation in Mississippi. Moreover, Mother did not explain how she intended to continue the children's medical treatment at Children's Hospital or with other medical providers when she does not have a vehicle.

{¶37} Particularly concerning, and as noted by the juvenile court, is the uncertainty regarding how Mother's treatment will progress when she disenrolls from the only drug treatment facility where she has achieved some degree of success. Given Mother's

behavior in the past, and the children's need for a secure placement at this time, we do not find anything in the record supporting the conclusion that Mother will be successful and follow through with her efforts now. Such a conclusion would be purely speculative. Notably, Mother acknowledged at trial that if a parent is not "clean" and is using methamphetamine, heroine, or similar drugs, they are not able to adequately care for their child. We will not experiment with the children's welfare to see if they will eventually suffer great detriment or harm. *In re B.C.*, 12th Dist. Warren Nos. CA2018-03-024 and CA208-03-027, 2018-Ohio-2673, ¶ 30, citing *In re R.S.-G.*, 4th Dist. Athens No. 15CA2, 2015-Ohio-4245, ¶ 53.

{¶38} Moreover, despite her recent progress since her release from jail, Mother had not successfully completed a single element of the case plan by the time of trial. Although Mother expressed a desire to reunify with the children, her failure to make significant progress on the case plan for nearly two years evidences her lack of commitment to the children. As this court has previously recognized, "'[a] child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re I.C.*, 12th Dist. Clinton Nos. CA2022-04-010 thru CA2022-04-012, 2022-Ohio-3101, ¶ 45, quoting *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 60. According to Mother's own testimony, she needs "a little more time" before she can provide such an environment, which time would presumably include moving back to Ohio, obtaining stable housing, transferring her probation, and her acceptance to a long-term treatment facility. While we acknowledge that Mother believes she can eventually provide adequate care for her children, and we commend her efforts, we simply cannot ignore Mother's admission that she was unable to provide the stability and care the children needed at the time of trial.

{¶39} "[A] parent is afforded a reasonable, not an indefinite, period to remedy the

conditions causing the children's removal." *In re K.P.*, 2022-Ohio-1347, at ¶ 43. Here, Mother is simply out of time. This is especially true given the two extensions of CCDJFS's temporary custody that have already taken place in this case. The juvenile court is not permitted to grant another extension. R.C. 2151.415(D)(4) ("No court shall grant an agency more than two extensions of temporary custody * * * and the court shall not order an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child first placed in shelter care, whichever date is earlier").

**{¶40}** Children are entitled to have stability in their lives by being placed in a legally secured permanent placement. A child's life is not an experiment that can be left to chance. Although Mother claims she simply needs more time to demonstrate her newly found commitment to her children and sobriety, this court cannot speculate whether she will continue to progress, despite the weight of the evidence demonstrating a long-term unwillingness or inability to complete any case plan objectives. *In re E.F.*, 12th Dist. Clinton Nos. CA2016-03-003 thru CA2016-03-007, 2016-Ohio-7265, ¶ 34. As noted by the magistrate, "a parent's past history is often one of the best predictors of future behavior." *In re M.J.P.L.*, 12th Dist. Clinton No. CA2014-03-008, 2013-Ohio-3406, ¶ 18.

**{¶41}** The final best interest factor is whether any of the factors in R.C. 2151.414(E)(7) to (11) apply in relation to Mother and the children. R.C. 2151.414(D)(1)(e). Of these, R.C. 2151.414(E)(10) is relevant. R.C. 2151.414(E)(10) applies when the parent "has abandoned the child." Both the magistrate and the juvenile court determined that Mother had abandoned the children. Mother has not disputed this finding. As we have repeatedly noted, "R.C. 2151.011(C) plainly states that '[f]or purposes of this chapter, a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, *regardless of whether the parents resume contact with the child after that period of ninety days*.'" (Emphasis sic.) *In re D.C.*,

- 17 -

12th Dist. Fayette No. CA2015-03-006, 2015-Ohio-3178, ¶ 38, quoting R.C. 2151.011(C). The juvenile court was presented with credible evidence that Mother had no contact or visitation with the children between April 2021 and February 2022 due to a series of incarcerations. This far exceeded the statutory 90-day period, and therefore constituted abandonment.

{¶42} Based on our review of the record, we conclude that the juvenile court did not err in determining that an award of permanent custody to CCDJFS was in the children's best interest. There is more than sufficient credible evidence to support the juvenile court's determination that the statutory standards for permanent custody have been met. As noted above, the children's best interests are served by being placed in a permanent situation that fosters growth, stability, and security. The record establishes that Mother could not provide these things at the time of trial. The juvenile court's conclusion was also not against the manifest weight of the evidence.

### C. Second Part of the Permanent Custody Test: "12 of 22" and Abandonment Analysis

{¶43} Turning to the second part of the permanent custody test, Mother does not challenge the juvenile court's finding under R.C. 2151.414(B)(1)(d) that the children had been in the temporary custody of CCDJFS for at least 12 months of a consecutive 22-month period or the court's finding under R.C. 2151.414(B)(1)(b) that Mother abandoned the children. In fact, Mother concedes the juvenile court's finding as to the second part of the permanent custody test is supported by the record. Because Mother does not challenge this "12 of 22" finding or the abandonment finding, we need not review the issue further. *In re J.N.L.H.*, 12th Dist. Butler No. CA2022-06-063, 2022-Ohio-3865, ¶ 26. However, we note that the record unquestionably establishes that the "12 of 22" finding was met in this case because Gia has been in the temporary custody of CCDJFS since March 2020, while

John and Joshua have been in the temporary custody of CCDJFS since April 2020. CCDJFS did not move for permanent custody of the children until February 1, 2022, nearly two years after the children were placed in CCDJFS's temporary custody. Likewise, the record unquestionably establishes that Mother abandoned the children. R.C. 2151.414(B)(1)(b). Therefore, there is no question that the second part of the permanent custody test was satisfied in this case.

### III. Conclusion

{¶44} In this case Mother was given many opportunities to regain custody of her children, but she failed to take advantage of them. Mother failed to satisfy most, if not all, of the case plan's requirements and the juvenile court concluded that it would be in the children's best interest to be placed in the permanent custody of CCDJFS. We have carefully reviewed the evidence in this case. We find that the juvenile court's determination that an award of permanent custody to CCDJFS is in the best interests of the children is supported by clear and convincing evidence and is not against the manifest weight of the evidence.

{¶45} Having found no merit to Mother's arguments, we overrule Mother's sole assignment of error.

{¶46} Judgment affirmed.

S. POWELL, P.J., and PIPER, J., concur.