[Cite as *In re B.S.*, 2024-Ohio-509.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

IN RE: :

    B.S. : CASE NO. CA2023-11-073

: O P I N I O N
2/12/2024

:

:

:

APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 2021JC5435

Christopher Bazeley, for appellant.

Mark J. Tekulve, Clermont County Prosecuting Attorney, and Nicholas A. Horton, Assistant Prosecuting Attorney, for appellee.

**BYRNE, P.J.**

{¶ 1} Appellant ("Mother"), the mother of minor child B.S. ("Beth"), appeals the decision of the Clermont County Court of Common Pleas, Juvenile Division, granting permanent custody of the child to the Clermont County Department of Job and Family

Services ("the Agency").[1]  For the reasons outlined below, we affirm the juvenile court's decision.

## I. Factual and Procedural Background

{¶ 2}   Beth was born to Mother in May 2012.  In 2021, Beth resided with Mother and Mother's live-in boyfriend, Harold Suddarth, in an RV, moving from campsite to campsite.  On October 12, 2021, based on a report that Beth had been subjected to sexual abuse by Suddarth, the Clermont County Prosecutor's Office filed a complaint in the juvenile court alleging that Beth was an abused child and requesting pre-dispositional temporary custody be granted to the Agency.  A hearing was held the same day and the juvenile court found that there was probable cause to believe Beth was abused, found that removal was necessary for Beth's protection, and granted pre-dispositional temporary custody to the Agency.  On November 10, 2021, Beth was adjudicated as neglected and dependent, and on November 30, 2021, the juvenile court awarded temporary custody of Beth to the Agency.

{¶ 3}   Of great concern to the Agency, Mother chose to continue living with Suddarth despite the sexual abuse allegations against him, and even after Beth was removed from her custody because of those allegations.  After Suddarth was arrested several months later, Mother still remained in contact with him at the Clermont County Jail.

{¶ 4}   On November 3, 2021, the Agency filed a case plan for Mother with the goal of reunification.  The plan was updated multiple times with the last changes approved on December 15, 2022. The case plan required Mother to: (1) maintain stable housing and income; (2) undergo a mental health assessment and treatment; (3) cooperate with the

---

1.  "Beth" is a pseudonym adopted in this opinion for purposes of privacy and readability.  *In re D.P.*, 12th Dist. Clermont Nos. CA2022-08-043 and CA2022-08-044, 2022-Ohio-4553, ¶ 1, fn. 1.

Agency while Beth was in foster care; (4) understand Beth's mental and physical health needs and follow all recommendations made by Beth's medical providers; and (5) complete parenting education.

{¶ 5} On March 15, 2022, a child support order was issued in Clermont County. Beth's father ("Father") last visited Beth on March 17, 2022, made no child support payments, and has effectively abandoned her. Mother has been largely compliant in paying child support and has been able to maintain suitable employment and housing.

{¶ 6} Pursuant to the case plan, Mother was engaged with LifeStance Mental Health for virtual therapy sessions. However, Mother had problems discussing her trauma with her therapists, did not take her medication as prescribed, and missed appointments, leading to Mother being terminated from LifeStance's program. The Agency then requested a full psychological evaluation, which Mother completed in October 2022. This full evaluation revealed a number of significant diagnoses including schizophrenia, borderline intellectual functioning, borderline personality disorder, and unspecified trauma and stressor-related disorders. A referral was made for more intensive treatment in November of 2022, but Mother did not pursue further treatment for three months, until she finally began her first assessment at Greater Cincinnati Behavioral Health on January 30, 2023.

{¶ 7} Although Mother began engaging more with her therapy around that time, she made minimal progress. Since 2012, Mother has had a history of reporting false pregnancies, suicidal ideations with plans, hearing voices telling her to harm herself or others, and beliefs that people were watching her, all of which continued through the pendency of this case. Mother went so far as to carry around ultrasound pictures that she had printed from the internet to convince Beth and others that she was pregnant, when she was not. Mother also devised a plan to buy a gun from a friend, go up on a

mountain, and kill herself if Beth was taken away. Mother was referred for joint therapy with Beth in order to help Beth heal from her sexual assault, but due to delays in Mother's progress, joint therapy had not yet begun at the time of the permanent custody hearing on May 17, 2023.

{¶ 8} Beth was placed in several different foster families until she was finally placed with her current foster family on July 30, 2022. Beth's current foster mother ("Foster Mother") testified that Beth came into her home desiring to be "in charge and tell everybody what to do," but Foster Mother has been working to redirect Beth to understand that adults are (supposed to be) authority figures in the household.

{¶ 9} When Beth was still living with Mother and Suddarth, they moved between various R.V. parks and did not have a consistent community of friends and neighbors. Despite Mother's own lack of education, Mother chose to homeschool Beth. Beth is far behind in both her educational and social development, and has difficulty playing and relating with other children her own age. During Mother's supervised visits with Beth, it was apparent through their interactions that Beth had assumed a parenting role over Mother. Beth would often try to comfort her Mother, put Mother's needs before her own, and would answer provider questions for her Mother. When Mother (falsely) told Beth she was pregnant, Beth was concerned with how Mother would be able to take care of another child. As Foster Mother observed, Beth had undergone a "parentification" in her relationship with Mother.

{¶ 10} Foster Mother also recognized that Beth has difficulty in school and is performing below her grade level. Beth now has an individual education plan at school and has extra time to finish her assignments. Foster Mother is also in touch with Beth's teachers at least once, and often twice, each week. Beth's foster placement has been beneficial for her socialization as well as for providing for her educational needs.

{¶ 11} Beth not only requires counseling due to the sexual abuse she suffered, but also has a variety of physical and developmental issues that require attention. Notably, Beth suffers from Townes-Brocks Syndrome and requires therapy to address symptoms such as hearing loss, vision issues, lack of coordination, and short bones. Prior to coming into foster care, Beth was not provided with any medical intervention for her condition, despite the fact that Mother knew of Beth's Townes-Brocks diagnosis when she was born. As a result, Beth has severe problems with flexibility in her ankles, causing her to walk only on the tips of her toes. While in foster care, Beth's caregivers finally pursued appropriate medical treatment, obtaining prescription leg braces, new glasses, and hearing aids for Beth.

{¶ 12} Under the case plan, Mother was required to engage personally in medical appointments for Beth in order to gain a greater understanding of Beth's needs. Beth has six to ten medical appointments per month, including nephrology, physical therapy, and mental health therapy. The Agency's caseworker, Shyla Jump, kept Mother apprised of the dates and times for all of Beth's appointments and encouraged Mother to attend. However, since receiving the case plan, Mother only attended three or four appointments and did not reach out to any of Beth's caregivers to keep abreast of Beth's progress. Foster Mother testified that at those few appointments Mother did attend, Mother was not aware of the medical care being provided to Beth, could not answer questions from the medical care provider, and did not ask any questions herself.

{¶ 13} Parenting education could not be addressed with Mother until she started making progress on the mental health aspect of her case plan. As a result, Mother did not start classes with Child Focus until March of 2023. Mother did not make any significant progress with regard to parenting skills by the time of the permanent custody hearing.

{¶ 14} The juvenile court granted a first extension of temporary custody on September 12, 2022, and a second extension on March 28, 2023. The Agency filed for permanent custody on February 10, 2023 and a permanent custody hearing was held on May 17, 2023. On October 19, 2023, the juvenile court granted the Agency's motion for permanent custody. Mother appealed the juvenile court's permanent custody decision on November 3, 2023.

## II. Legal Analysis

{¶ 15} Mother's sole assignment of error states:

> THE JUVENILE COURT'S DECISION TERMINATING [MOTHER'S] PARENTAL RIGHTS WAS AGAINST THE WEIGHT OF THE EVIDENCE

{¶ 16} On appeal, Mother argues that the juvenile court's decision granting permanent custody of Beth to the Agency was against the manifest weight of the evidence. Specifically, Mother asserts that the juvenile court erred in its analysis when it held that terminating her parental rights was in Beth's best interest. Mother argues: (1) the juvenile court failed to properly consider the interaction and interrelationship between her and Beth, as required by R.C. 2151.414(D)(1)(a); (2) the juvenile court failed to properly consider Beth's wishes, as required by R.C. 2151.414(D)(1)(b); and (3) when considering Beth's need for legally secure placement, the juvenile court should have given more weight to the progress Mother made with respect to her mental health treatment and her ability to maintain stable housing and income.

## A. Applicable Law and Standards of Review

{¶ 17} "Before a natural parent's constitutionally protected liberty interest in the care and custody of [her] child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met." *In re M.G.*, 12th Dist. Brown No. CA2022-11-010, 2023-Ohio-1316, ¶ 44; R.C.

2151.414(E). Under R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re K.P.*, 12th Dist. Preble No. CA2021-11-016, 2022-Ohio-1347, ¶ 17. First, R.C. 2151.414(B)(1) provides that the juvenile court must find that the grant of permanent custody to the agency is in the "best interest" of the child. *In re M.H.*, 12th Dist. Clermont Nos. CA2021-08-047 thru CA2021-08-049, 2022-Ohio-48, ¶ 35. Second, the juvenile court must find that one of the circumstances set forth in R.C. 2151.414(B)(1)(a) to (e) apply. *In re R.B.*, 12th Dist. Butler Nos. CA2022-01-003 and CA2022-01-004, 2022-Ohio-1705, ¶ 31. Those circumstances include, but are not limited to: (1) the child is abandoned, R.C. 2151.414(B)(1)(b); (2) the child is orphaned, R.C. 2151.414(B)(1)(c); (3) the child has been in the temporary custody of one or more public children services agencies for 12 or more months of a consecutive 22-month period, R.C. 2151.414(B)(1)(d); and (4) none of the previous three circumstances applies, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the parents, R.C. 2151.414(B)(1)(a). Only one of these circumstances need apply to satisfy the second prong of the two-part permanent custody test. *In re C.S.*, 12th Dist. Clinton No. CA2020-04-006, 2020-Ohio-4414, ¶ 16.

{¶ 18} "An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination." *In re A.S.*, 12th Dist. Butler Nos. CA2019-05-071 thru CA2019-05-073, 2019-Ohio-4127, ¶ 19. However, "[e]ven if there is sufficient evidence to support the juvenile court's decision, an appellate court may nevertheless reverse a permanent custody judgment if it finds the judgment to be against the manifest weight of the evidence." *In re G.A.*, 12th Dist. Clermont No. CA2022-11-079, 2023-Ohio-643, ¶ 18, citing *In re F.S.*, 12th Dist. Fayette Nos. CA2020-08-011 and

- 7 -

CA2020-08-012, 2021-Ohio-345, ¶ 61. In determining whether a juvenile court's judgment is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 12th Dist. Warren Nos. CA2018-08-088 thru CA2018-08-091 and CA2018-08-095 thru CA2018-08-097, 2019-Ohio-198, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. The presumption in weighing the evidence favors the finder of fact, which we are especially mindful of in custody cases. *In re R.K.*, 12th Dist. Warren Nos. CA2021-03-027 and CA2021-03-028, 2021-Ohio-3074, ¶ 15. Therefore, if the evidence is susceptible to more than one construction, the reviewing court is bound to give it the interpretation that is consistent with the verdict and judgment. *In re D.S.*, 12th Dist. Clinton Nos. CA2021-10-030 and CA2021-10-031, 2022-Ohio-998, ¶ 63.

**B. First Part of the Permanent Custody Test: Best Interest Analysis**

{¶ 19} R.C. 2151.414(D)(1) provides that in considering the best interest of a child in a permanent custody hearing, a juvenile court must consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month

period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 20} A juvenile court may also consider any other factors it deems relevant to the child's best interest. *In re A.J.*, 12th Dist. Clermont No. CA2018-08-063, 2019-Ohio-593, ¶ 24.

{¶ 21} Here, the juvenile court carefully considered each of the best interest factors set out in R.C. 2151.414(D) and found that it was in Beth's best interest to grant permanent custody to the Agency. We agree with the juvenile court.

{¶ 22} As to the first best interest factor—that is, the interaction and interrelationship of the child with her parents, foster caregivers, and others, R.C. 2151.414(D)(1)(a)—the evidence demonstrates that Mother and Beth have a close bond, albeit a very unhealthy one. "It is well established that permanent custody is not contrary to a child's best interest simply because a parent loves their child and the two share a strong bond." *In re G.A.*, 12th Dist. Clermont No. CA2022-11-079, 2023-Ohio-643, ¶ 27. This is instead "one factor to be considered when determining the best interest of a child in a permanent custody proceeding." *In re G.W.*, 12th Dist. Butler No. CA2019-01-003, 2019-Ohio-1586, ¶ 48. Mother argues that this factor weighs in her favor because Beth regularly expresses concern for Mother, Mother's supervised visits with Beth have gone well, and the guardian ad litem for Beth testified that visitation should continue even after Beth's adoption because she and Mother have a strong connection. However, Beth's interactions with Mother demonstrated a concerning role reversal where Beth would assume a parenting role over Mother. Beth habitually attempted to answer questions on

- 9 -

Mother's behalf, and when Mother was falsely claiming to be pregnant, Beth expressed concern for how Mother would be able to take care of another child. This "parentification" has led Beth to try to assume an authority role in her foster home and to attempt to solve everyone else's problems. The evidence suggests Mother's behavior facilitated this improper role reversal.

{¶ 23} As to Mother's role in her relationship with Beth, Mother has demonstrated a serious lack of responsibility and awareness for Beth's needs and well-being. Mother failed to recognize the sexual abuse Beth had suffered at the hands of Suddarth, and even maintained contact with him after his arrest despite the Agency's instruction not to do so. Although Mother was aware of Beth's Townes-Brocks diagnosis when she was born, Mother failed to provide for Beth's medical needs, with Beth's "toe walking" left entirely unaddressed until she was placed in foster care. When Beth came into the care of the Agency, neither her hearing aids nor her glasses fit properly, and she needed both replaced. Although Mother was encouraged to participate in Beth's medical appointments while in foster care, Mother only attended three or four appointments and demonstrated a lack of understanding and engagement. Mother did not ask any questions of the medical staff and in turn could not answer their questions.

{¶ 24} By contrast, in her foster placement Beth has received attentive medical care, proper socialization, and increased attention in school. The juvenile court properly found that the first best interest factor weighed in favor of the Agency receiving permanent custody.

{¶ 25} As to the second best interest factor—the wishes of the child, R.C. 2151.414(D)(1)(b)—the juvenile court interviewed Beth in camera. Beth expressed that she wished her mother could take care of her, but also realized and accepted that Mother may not be capable of doing so, and therefore returning to her Mother's care may not be

- 10 -

possible. This factor weighed in favor of the Agency receiving permanent custody.

{¶ 26} As to the third best interest factor—the custodial history of the child, R.C. 2151.414(D)(1)(c)—at the time the Agency filed its motion for permanent custody, Beth had been in the Agency's custody for a period in excess of 12 out of 22 consecutive months. This factor weighed in favor of the Agency receiving permanent custody.

{¶ 27} As to the fourth best interest factor—the "child's need for a legally secure permanent placement," R.C. 2151.414(D)(1)(d)—the juvenile court recognized that Mother has an extensive and ongoing history of mental health problems. Mother argues that more weight should have been given to her ability to maintain stable housing and income, as well as to the progress she did make in her mental health treatment. However, the record indicates that Mother has been inconsistent at best in pursuing mental health treatment. Mother's lack of progress in her own mental health treatment prevented her from participating in joint therapy with Beth before the permanent custody hearing, and prevented her from making significant progress in parent education classes under the case plan. Mother's delusions, paranoia, and suicidal ideations indicate that she is not suited to provide for Beth's own extensive healthcare and socialization needs. Children with numerous special needs require an environment where their needs will be met on a consistent basis. *In re L.R.*, Ninth Dist. Summit Nos. 29266 and 29271, 2019-Ohio-2305, ¶ 52. Again, this factor weighed in favor of the Agency receiving permanent custody.

{¶ 28} In a recent permanent custody decision, we stated:

> The credibility of witnesses and the weight given to their testimony are primarily matters for the finder of fact. *In re R.B.*, 12th Dist. Warren No. CA2023-03-032, 2023-Ohio-3145, ¶ 26. Where evidence is susceptible to more than one construction, we are required to give it the interpretation most favorable and consistent with the verdict and judgment. *Id.* Although Mother presented some favorable testimony at trial, we find that the juvenile court did not err in concluding that it was outweighed by other evidence of Mother's severe and

ongoing mental health problems and her inability to provide appropriate care to [her child]. Accordingly, the juvenile court did not err in finding the best interest factors weighed in favor of awarding permanent custody to the agency.

*In re J.F.*, 12th Dist. Butler No. CA2023-06-065, 2023-Ohio-4244, ¶ 25. All of these statements apply equally here. The juvenile court did not fail to properly consider the interaction and interrelationship between her and Beth, did not fail to properly consider Beth's wishes, and did not give too little weight to the progress Mother made with respect to her mental health treatment and her ability to maintain stable housing and income. We conclude that the juvenile court did not err in finding the best interest factors weighed in favor of awarding permanent custody to the Agency.

**C. Second Part of the Permanent Custody Test**

{¶ 29} Mother on appeal does not challenge the juvenile court's finding under R.C. 2151.414(B)(1)(d) that Beth had been in the temporary custody of the Agency for at least 12 months of a consecutive 22-month period. Because Mother does not challenge this "12 of 22" finding, we need not review the issue further.[2] *In re J.N.L.H.*, 12th Dist. Butler No. CA2022-06-063, 2022-Ohio-3865, ¶ 26. However, we note that the record unquestionably establishes that the "12 of 22" finding was met in this case because Beth was adjudicated dependent in November 2021, and Beth remained in the Agency's custody through the date the agency filed for permanent custody, in February 2023.

**III. Conclusion**

{¶ 30} In light of the foregoing, we conclude the juvenile court did not err by determining that it was in Beth's best interest to grant permanent custody to the Agency.

---

2. In her brief, Mother suggests that she could have made more progress on the case plan had the juvenile court waited 22 months before granting permanent custody, but concedes that there is no statutory requirement to do so. More precisely, there is no requirement that the Agency wait until a child has been in its custody for 22 months before filing a motion for permanent custody. *See In re N.M.P.*, 160 Ohio St.3d 472, 2020-Ohio-1458, ¶ 23. We note that in fact the juvenile court granted permanent custody to the Agency over 24 months after Beth had been removed from Mother's custody.

As such, we find the juvenile court's decision to grant permanent custody of Beth to the Agency was supported by clear and convincing evidence and was not against the manifest weight of the evidence. Mother's sole assignment of error is overruled.

{¶ 31} Judgment affirmed.

PIPER and M. POWELL, JJ., concur.