[Cite as *In re B.G.*, 2024-Ohio-1731.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

PREBLE COUNTY


IN RE:                                    :

    B.G.                                 :          CASE NO. CA2024-01-001

                                   :          O P I N I O N
                                        5/6/2024

                                   :

                                   :

                                   :


APPEAL FROM PREBLE COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 20213109


David J. Fierst, for appellant.

Martin P. Votel, Preble County Prosecuting Attorney, and Sean Brinkman, Assistant Prosecuting Attorney, for appellee.


**HENDRICKSON, J.**

{¶ 1} Appellant ("Mother"), the mother of "Bridget," appeals the decision of the Preble County Court of Common Pleas, Juvenile Division, granting permanent custody of the child to Preble County Children Services ("the Agency").[1] For the reasons outlined

---

1. "Bridget" is a pseudonym adopted in this opinion for purposes of privacy and readability. *In re D.P.*, 12th Dist. Clermont Nos. CA2022-08-043 and CA2022-08-044, 2022-Ohio-4553, ¶ 1, fn. 1.

below, we affirm the juvenile court's decision.

## I. Factual and Procedural Background

{¶ 2}   Bridget was born to Mother in 2015.  Bridget's father is unknown.  In 2021, Bridget lived with Mother and Mother's boyfriend, Ron.  In October of 2021, the Agency received a referral and became involved with Bridget due to concerns of domestic violence in the home.  Mother was arrested for domestic violence and assault against Ron, and Bridget was reported to have been accidentally struck by an object during the altercation.  Mother and Ron pursued restraining orders against each other, and the Agency closed its case as it appeared the two were not going to have further contact with one another.  However, only a few weeks later, the Agency received reports that Mother had moved back into Ron's home and Bridget was having problems with tardiness and missing school.  On October 28, 2021, Bridget was dropped off at a neighbor's house after school and Mother could not be reached to pick her up.  Bridget missed school the following day.

{¶ 3}   On November 1, 2021, the Agency received another referral reporting that there was another altercation between Mother and Ron where law enforcement was called.  On November 2, 2021, a pick-up order was requested and issued, and Bridget was placed in the temporary custody of the Agency.  On November 3, 2021, a complaint was filed alleging that Bridget was a dependent child.  Further proceedings were continued several times by agreement of the parties.  On March 3, 2022, Mother admitted that Bridget was a dependent child, and the juvenile court ordered that Bridget remain in the temporary custody of the Agency.

{¶ 4}   In November 2021, the Agency prepared a case plan with the goal of reunification, and on January 6, 2022, the juvenile court approved the case plan.  The case plan required Mother to participate in case management services through the

Agency, to complete a parenting class, complete a domestic violence assessment and follow the recommendations of the provider, and to complete a full psychological evaluation and follow the recommendations of the provider. On October 17, 2022, an amended case plan was approved with the same requirements for Mother.[2]

**{¶ 5}** On October 10, 2022, the Agency filed a motion for permanent custody. On January 17, 2023, the CASA filed a report supporting permanent custody. The juvenile court held a permanent custody hearing on January 19, 2023 and March 7, 2023. No transcripts of these hearings were filed in the present appeal. On April 12, 2023, the juvenile court denied the Agency's motion for permanent custody and ordered that Bridget remain in the temporary custody of the Agency. In that decision, the juvenile court found that, except for finishing the parenting class, Mother had made little progress in completing the objectives of her case plan. However, the particular domestic violence program that was originally specified in the case plan had ceased to be offered by the provider at some point after the case plan was put into place. Therefore, the juvenile court decided that Mother would be provided additional time to complete a different domestic violence assessment along with the other case plan objectives.

**{¶ 6}** Mother failed to make further progress on her case plan, and on May 5, 2023, the Agency filed a second motion for permanent custody. On September 13, 2023, the CASA again filed a report supporting permanent custody. The CASA reported that Bridget was doing well in foster placement, and that she had come a long way medically, academically, and socially. When the CASA asked Bridget what her favorite thing about her foster mother was, Bridget said "I get to eat dinner every night, like every night."

**{¶ 7}** On September 15, 2023 a permanent custody hearing was held. Mother's

---

2. The amended case plan removed the person previously believed to be Bridget's father after DNA testing revealed he was not her father.

counsel requested that the testimony presented at the prior permanent custody hearing be considered in addition to the new evidence presented, and the juvenile court granted the request. At the hearing, the juvenile court heard testimony from Bridget's foster mother; the Agency caseworker; and Mother.

{¶ 8} The foster mother testified that since the previous custody hearing, there had been one concerning phone call between Mother and Bridget in which Mother sounded erratic and repeatedly asked Bridget whether she had begun school, despite Bridget already answering yes and becoming very frustrated. The foster mother also testified that she and her husband were interested in adopting Bridget, but were not sure if they would be able to because her husband's career may require them to move out of state.

{¶ 9} The caseworker testified that Mother still had not completed any domestic violence assessment, despite the Agency providing a referral for an individual assessment with a provider, Family Services, in Dayton, Ohio. Further, the Agency was concerned that Mother continued to live with Ron, despite their previous history of domestic violence and Mother's failure to complete the domestic violence assessment. The caseworker also testified that the Agency developed concerns that Mother was abusing drugs and alcohol, that Mother continually tested positive for THC without any prescription, and that Mother tested positive for methamphetamine on one occasion. Although it was not specifically part of the case plan, Mother pursued drug and alcohol treatment and mental health treatment. However, the caseworker testified that Mother did not sign any releases of information for these treatments, so the Agency was unable to track progress. Ultimately, Mother failed to complete either program. The caseworker testified that Mother's positive drug screens and lack of progress on the case plan precluded her from increasing the frequency of scheduled visits with Bridget. Bridget

reported that she really likes living in the foster home, wants to stay there, and only wants to visit her Mother on holidays.

{¶ 10} Mother testified that she stopped attending drug and alcohol treatment due to problems with insurance. Mother explained that she was continuing her mental health treatment, but her attendance had fallen off due to her work schedule. Mother stated that she believed this therapy was the same as a psychological evaluation for purposes of the case plan, and that she thought she had signed releases of information. In her testimony, Mother claimed that she received a prescription for THC in Maine for a rare form of cancer but admitted that she never produced any documentation to that effect. Mother also testified that she had a strong bond with Bridget. Finally, Mother testified that the Agency did not provide her with a new referral for a domestic violence assessment prior to filing the second motion for permanent custody.

{¶ 11} On January 16, 2024, the juvenile court granted permanent custody of Bridget to the Agency. On January 19, 2024, Mother appealed the juvenile court's permanent custody decision.

## II. Legal Analysis

{¶ 12} Mother raises the following two assignments of error for our review:

{¶ 13} Assignment of Error No. 1:

THE DECISION AWARDING PERMANENT CUSTODY OF B.G. TO THE PREBLE COUNTY JOB AND FAMILY SERVICES, CHILDREN'S SERVICES DIVISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 14} Assignment of Error No. 2:

THE CASA REPORT IN THE CASE BELOW WAS DEFICIENT.

{¶ 15} For ease of discussion, we address these assignments of error together.

{¶ 16} Mother argues that the juvenile court's decision was against the manifest

weight of the evidence for the following reasons: (1) the court placed too much weight on Mother's failure to complete a psychological evaluation and impermissibly relied on its own speculation that Mother's positive drug tests prevented her from completing a psychological evaluation; (2) it is implied that Mother must have completed a psychological evaluation, as she was able to participate in mental health treatment, and completion of a psychological evaluation should have been a prerequisite; (3) the court did not delineate what Mother had failed to do since the Agency's first motion for permanent custody, which was denied; and (4) The CASA report was deficient because it did not address potential problems with the foster family's ability to adopt Bridget, and it did not establish Bridget's level of maturity. We disagree.

## A. Applicable Law and Standards of Review

{¶ 17} "Before a natural parent's constitutionally protected liberty interest in the care and custody of [her] child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met." *In re M.G.*, 12th Dist. Brown No. CA2022-11-010, 2023-Ohio-1316, ¶ 44; R.C. 2151.414(E). Under R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re K.P.*, 12th Dist. Preble No. CA2021-11-016, 2022-Ohio-1347, ¶ 17. First, R.C. 2151.414(B)(1) provides that the juvenile court must find that the grant of permanent custody to the agency is in the "best interest" of the child. *In re M.H.*, 12th Dist. Clermont Nos. CA2021-08-047 thru CA2021-08-049, 2022-Ohio-48, ¶ 35. Second, the juvenile court must find that one of the circumstances set forth in R.C. 2151.414(B)(1)(a) to (e) apply. *In re R.B.*, 12th Dist. Preble Nos. CA2022-01-003 and CA2022-01-004, 2022-Ohio-1705, ¶ 31. Those circumstances include, but are not limited to: (1) the child is abandoned, R.C. 2151.414(B)(1)(b); (2) the child is orphaned,

R.C. 2151.414(B)(1)(c); (3) the child has been in the temporary custody of one or more public children services agencies for 12 or more months of a consecutive 22-month period, R.C. 2151.414(B)(1)(d); and (4) none of the previous three circumstances applies, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the parents, R.C. 2151.414(B)(1)(a). Only one of these circumstances need apply to satisfy the second prong of the two-part permanent custody test. *In re C.S.*, 12th Dist. Clinton No. CA2020-04-006, 2020-Ohio-4414, ¶ 16.

{¶ 18} "An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination." *In re A.S.*, 12th Dist. Preble Nos. CA2019-05-071 thru CA2019-05-073, 2019-Ohio-4127, ¶ 19. However, "[e]ven if there is sufficient evidence to support the juvenile court's decision, an appellate court may nevertheless reverse a permanent custody judgment if it finds the judgment to be against the manifest weight of the evidence." *In re G.A.*, 12th Dist. Clermont No. CA2022-11-079, 2023-Ohio-643, ¶ 18, citing *In re F.S.*, 12th Dist. Fayette Nos. CA2020-08-011 and CA2020-08-012, 2021-Ohio-345, ¶ 61. In determining whether a juvenile court's judgment is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 12th Dist. Warren Nos. CA2018-08-088 thru CA2018-08-091 and CA2018-08-095 thru CA2018-08-097, 2019-Ohio-198, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. The presumption in weighing the evidence favors the finder of fact, which we are especially mindful of in custody cases. *In re R.K.*, 12th Dist. Warren Nos. CA2021-03-027 and CA2021-03-028,

2021-Ohio-3074, ¶ 15. Therefore, if the evidence is susceptible to more than one construction, the reviewing court is bound to give it the interpretation that is consistent with the verdict and judgment. *In re D.S.*, 12th Dist. Clinton Nos. CA2021-10-030 and CA2021-10-031, 2022-Ohio-998, ¶ 63.

### B. First Part of the Permanent Custody Test: Best Interest Analysis

{¶ 19} R.C. 2151.414(D)(1) provides that in considering the best interest of a child in a permanent custody hearing, a juvenile court must consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 20} A juvenile court may also consider any other factors it deems relevant to the child's best interest. *In re A.J.*, 12th Dist. Clermont No. CA2018-08-063, 2019-Ohio-593, ¶ 24. "Noncompliance with a case plan is a consideration for the termination of parental rights." *In re S.S.*, 12th Dist. Clermont No. CA2023-04-020, 2023-Ohio-2916, ¶ 20.

{¶ 21} Contrary to Mother's arguments, the court did not place too much weight on Mother's failure to complete the psychological evaluation, nor did it improperly speculate

on the impact of her drug tests on her ability to complete a psychological evaluation. Here, the juvenile court carefully considered each of the best interest factors set out in R.C. 2151.414(D) and found that it was in Bridget's best interest to grant permanent custody to the Agency. We agree with the juvenile court.

{¶ 22} As to the first best interest factor—that is, the interaction and interrelationship of the child with her parents, foster caregivers, and others, R.C. 2151.414(D)(1)(a)—the evidence demonstrates that Mother and Bridget have a bond, however there are problems in their relationship. Mother has demonstrated a lack of commitment to Bridget as evidenced by her decision to continue living with Ron—despite their history of domestic violence triggering Bridget's removal from the home, and Mother's lack of progress on her case plan—having failed to complete the domestic violence assessment, the psychological evaluation, mental health treatment, and drug and alcohol treatment. Further, Mother frequently rescheduled calls and visits with Bridget and has been unable to increase the frequency of scheduled visits due to positive drug tests and her lack of progress on the case plan. Bridget enjoyed visits and calls with her Mother so long as Mother was attentive but became frustrated when Mother behaved erratically or asked questions repetitively.

{¶ 23} By contrast, in her foster placement Bridget has received attentive medical care (receiving up to date vaccinations), improved in school, and improved her social skills. Of note was Bridget's comment to the CASA that her favorite part about living in her foster home is that "I get to eat every night, like every night." The first best interest factor weighed in favor of the Agency receiving permanent custody.

{¶ 24} As to the second best interest factor—the wishes of the child, R.C. 2151.414(D)(1)(b)—Bridget told the Agency's caseworker that she would like to continue living with her foster family and just see her Mother on holidays. The CASA's report also

supported that Bridget wished to remain with her foster family. On appeal, Mother argues that the report from the CASA was inadequate, as it failed to establish Bridget's level of maturity and did not address how removal from the foster home might affect Bridget. Instead, Mother suggests that additional testimony from a mental health professional was necessary. Nevertheless, there was no requirement for the CASA to address these issues in her report and no requirement for additional testimony. The juvenile court was able to weigh the CASA's report along with the other evidence. The second best interest factor weighed in favor of the Agency receiving permanent custody.

{¶ 25} As to the third best interest factor—the custodial history of the child, R.C. 2151.414(D)(1)(c)—at the time the Agency filed its second motion for permanent custody in May 2023, Bridget had been in the Agency's custody for a period in excess of 12 out of 22 consecutive months. This factor weighed in favor of the Agency receiving permanent custody.

{¶ 26} As to the fourth best interest factor—the "child's need for a legally secure permanent placement," R.C. 2151.414(D)(1)(d)—the juvenile court recognized that Mother has an ongoing drug problem, having continually tested positive for THC and positive for methamphetamine on one occasion. The juvenile court further recognized that Mother has failed to properly address her previous history of domestic violence by not completing the domestic violence assessment as mandated by the case plan, and by continuing to live with Ron. Further, Mother has failed to properly address her mental health, having failed to complete the psychological evaluation mandated by the case plan and consistently attend mental health therapy.

{¶ 27} On appeal, Mother argues that because there is no transcript from the first permanent custody hearing, it is unclear that she actually failed to complete the psychological evaluation. She further argues that the fact she completed some mental

health treatment implies that she did in fact complete her psychological evaluation. Nevertheless, there is nothing in the record to support this inference. "Since the appealing party bears the burden of showing error in the underlying proceeding by reference to matters in the record, the appellant has a duty to provide a transcript for appellate review." *State v. Williams*, 12th Dist. Clermont No. CA2012-Ohio-08-060, 2013-Ohio-1387, ¶ 18; *see* App.R. 9(B); *see also* App. R. 16(A)(7). "Where portions of the transcript necessary for resolution of assigned errors are omitted from the record, the reviewing court has nothing to pass upon and thus has no choice but to presume the regularity or validity of the lower court's proceedings and affirm." *Knapp v. Edwards Laboratories*, 61 Ohio St.2d 197, 199 (1980). Thus we presume regularity in the first permanent custody hearing. In the second permanent custody hearing, the caseworker testified that she discussed the need to have a psychological evaluation with Mother, and Mother indicated to her that she had not pursued one. Further, Mother never provided any documentation that she had completed such an evaluation. The juvenile court properly found that Mother had failed to complete her psychological evaluation. Again, this factor weighed in favor of the Agency receiving permanent custody.

{¶ 28} Finally, Mother generally argues that it is not clear what the trial court expected Mother to address between the denial of the Agency's first motion for permanent custody and its second motion, and the fact that the first motion was denied should weigh in her favor. The juvenile court's entry on April 12, 2023 made it clear that Mother was deficient in completing all of the case plan objectives except for the parenting class, but granted her more time because of problems in scheduling the domestic violence assessment. The court stressed that Mother needed to accomplish the case plan objectives and emphasized completing the domestic violence assessment; however, by the time of the second permanent custody hearing, Mother had not complied.

## C. Second Part of the Permanent Custody Test

{¶ 29} Mother does not challenge the juvenile court's finding under R.C. 2151.414(B)(1)(d) that Bridget had been in the temporary custody of CCDJFS for at least 12 months of a consecutive 22-month period. Because Mother does not challenge this "12 of 22" finding, we need not review the issue further. *In re J.N.L.H.*, 12th Dist. Preble No. CA2022-06-063, 2022-Ohio-3865, ¶ 26. However, we note that the record unquestionably establishes that the "12 of 22" finding was met in this case because Bridget was adjudicated dependent in March 2022, and remained in the Agency's custody through the filing of the Agency's second motion for permanent custody in May 2023.

## III. Conclusion

{¶ 30} In light of the foregoing, we conclude the juvenile court did not err by determining that it was in Bridget's best interest to grant permanent custody to the Agency. As such, we find the juvenile court's decision was supported by clear and convincing evidence and was not against the manifest weight of the evidence. Mother's two assignments of error are overruled.

{¶ 31} Judgment affirmed.

S. POWELL, P.J., and M. POWELL, J., concur.